**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Eddie PADIN (85–5115), Terrance Sweigart (85–5116), Frank L. Carlin (85–5117), Raymond T. Bottari (85–5118), Robin L. Pettigrew (85–5119), Defendants-Appellants.**

**Nos. 85–5115 to 85–5119.**

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 11, 1985.

Decided April 10, 1986.

Sherman C. Magidson (argued), Chicago, Ill., for Eddie Padin.

Michael R. Tucker (argued) (Court-appointed), Memphis, Tenn., for Terrance Sweigart.

W. Hickman Ewing, Jr., U.S. Atty., Memphis, Tenn., Timothy R. DiScenza (argued), for U.S.

Warner Hodges, III (argued) (Court-appointed), Germantown, Tenn., for Frank L. Carlin.

Jack Kopald (argued) (Court-appointed), Wildman, Harrold, Allen, Dixon, & McDonnell, Memphis, Tenn., for Raymond T. Bottari.

Stephen B. Shankman (argued) (Court-appointed), Manire & Clifton, Memphis, Tenn., for Robin L. Pettigrew.

Before ENGEL and KRUPANSKY, Circuit Judges, and SUHRHEINRICH, District Judge.[*]

KRUPANSKY, Circuit Judge.

Appellants Eddie Padin (Padin), Terrance Sweigart (Sweigart), Frank LeRoy Carlin (Carlin), Raymond Theodore Bottari (Bottari) and Robin Lee Pettigrew (Pettigrew) appealed their convictions for various drug offenses in violation of 21 U.S.C. §§ 841, 846 and 18 U.S.C. § 2.

On October 16, 1983, appellant Carlin, national president of the Iron Horsemen Motorcycle Club (IHMC), his girlfriend, Amy Ladd (Ladd), and Marie Pettigrew, wife of the appellant Robin Lee Pettigrew, rented two rooms at the Memphis Airport Hilton in Memphis, Tennessee. On October 20, 1983, appellant Padin and his then girlfriend, Gayle, rented a third room at the same hotel. The rooms at the Hilton were occupied until October 28, 1983.

While appellants Carlin and Padin were residing at the Hilton, John Kresser (Kresser), Jamie McCloud (McCloud), and appellant Sweigart purchased cocaine from them at the hotel. On October 24, 1983, Padin leased a five-bedroom house located at 5162 Skippy Street in Memphis, Tennessee (Skip-

* Hon. Richard F. Suhrheinrich, United States District Judge for the Eastern District of Michigan, sitting by designation.

py Street). The house was leased in Padin's name. The telephone was listed in Padin's name. Initially, the house was occupied by Padin, his girlfriend Gayle, and appellant Carlin and his girlfriend Ladd. Sometime in November, Sweigart and Christine Smock (Smock), who had been living at the Iron Horsemen clubhouse, moved into the house on Skippy Street.

Padin resided in the Skippy Street house until approximately Thanksgiving of 1983 at which time he returned to Chicago. Nonetheless, Padin continued to regularly pay the rent either directly or through a representative. In addition, the Skippy Street telephone continued to be listed in his name.

During the relevant time period, cocaine was shipped via Federal Express to Carlin, Ladd, Smock, and Carlin's son, Golden Carlin, at the Skippy Street residence by "Dave's Harley", 4611 South Talman, Chicago, Illinois. Federal Express records also disclosed that packages had been shipped from Memphis to undisclosed locations by Padin and McCloud. Shipments of cocaine into Memphis, Tennessee via Federal Express were discontinued on December 15, 1983, upon the arrest of Golden Carlin at the Federal Express terminal when he appeared to accept delivery of a package containing cocaine.

On November 21, 1983, Kresser was introduced to DEA undercover agent Kelly Goodowens (Goodowens). Thereafter, on November 29, 1983, Kresser and McCloud sold Goodowens one ounce of cocaine. Both Kresser and McCloud asserted that the cocaine came from Skippy Street.

Kresser and McCloud made a second sale of two ounces of cocaine to Goodowens on December 21, 1983. Following this sale, Goodowens, Kresser and McCloud discussed via telephone the possibility of a future sale of one pound or more of cocaine. Negotiations continued until January 17, 1984 when Goodowens arranged to purchase two pounds of cocaine on January 20 at Katie's Kitchen on Shelby Drive in Memphis.

On January 16 or 17, Kresser telephoned Carlin and finalized their plans. Carlin told Kresser that he would have to telephone "up north for the cocaine." The final price was $1,500 per ounce or $48,000.00.

At noon on January 20, 1984, McCloud and Kresser met Goodowens as planned at Katie's Kitchen. At that time, Goodowens and Kresser agreed to split the sale.[1] McCloud drove to the Skippy Street house where she met appellants Carlin and Bottari and related Kresser's instructions to Carlin. Bottari agreed to split the sale as directed by Kresser. Thereafter, Carlin and Bottari placed a plastic bag of cocaine into a black cardboard box, stuffed it with sections of a Chicago newspaper, and placed the box into a sack for delivery by McCloud.

McCloud returned to Katie's Kitchen with the package. Upon a pre-arranged signal, officers converged on the group and arrested Kresser and McCloud. Shortly thereafter, both Kresser and McCloud agreed to cooperate with government officials and identified the Skippy Street residence as the source of the cocaine. They also indicated that the second pound of cocaine was at Skippy Street, that there were weapons in the house, and that the cocaine would be destroyed if McCloud did not return within thirty minutes. McCloud, Kresser and the agents proceeded to Skippy Street and at approximately 1:50 p.m., agents and officers effected a forcible entry to secure the premises while a search warrant was being obtained. Although the occupants of the house were detained, the premises were not physically searched at that point in time.

1. In drug parlance, "splitting the sale" is a procedure that guards against non-performance by one or more of the parties. In general, the procedure involves a four-stage transaction whereby (1) the purchaser displays the purchase money to the seller, (2) the seller delivers one half of the cocaine, (3) the purchaser tenders one half of the purchase price, and (4) the seller returns with the second half of the cocaine at which time a simultaneous exchange of cocaine and money concludes the transaction.

Shortly thereafter, the telephone began to ring. Deputy Sheriff Gerald Peterson (Peterson) answered the first call. After the call was completed, Captain Joe Holt of the Memphis Police Department instructed Peterson to answer all incoming calls and to record in writing any conversations he had with the callers.

Approximately one hour and twenty minutes elapsed before officers at the house were advised by telephone that the United States Magistrate had issued a search warrant. During the time interval between the original entry and the issuance of the warrant, Peterson received two additional telephone calls from a caller who, without inquiry from Peterson, voluntarily identified himself as "Fast" and asked to speak to Terry.[2] The caller required no identification of the person answering the phone. Peterson informed "Fast" that Terry was not at the house. On one occasion the caller asked Peterson if he knew "if my man from Chicago had arrived yet."

Upon execution of the search warrant, Special DEA Agent Michael Childers (Childers) discovered one and a quarter pounds of cocaine in a hall closet. Peterson found three ounces of cocaine in a plastic bag on the top shelf of a bookcase in the downstairs bedroom. Several weapons were also seized.

DEA Agent Thomas Sprague (Sprague) and FBI Agent Corbett Hart (Hart) interviewed McCloud on January 25, 1984, five days after McCloud's arrest and the search of the premises on Skippy Street. Sprague was the principal interrogator and made notes of the interview. He requested McCloud to briefly summarize her involvement in the conspiracy and thereafter directed her to respond to a series of questions. Sprague editorialized in written form the substance of McCloud's responses to his specific inquiries. His notations did not take the form of a verbatim question and answer record. When Sprague concluded his interrogation of McCloud, he did not review his notes with her. Subsequent-

ly, he used the notes to dictate a debriefing report.

All five appellants were named in Count I of the indictment and charged with conspiring to possess and distribute cocaine. Thirty-seven overt acts were enumerated in Count I. Count II charged appellants Padin and Carlin with possession and distribution of cocaine in connection with the November 29, 1983 sale to Goodowens. Carlin was also charged in counts III and IV with possession and distribution as a result of the December 15, 1983 Federal Express delivery and the December 21, 1983 sale to Goodowens. Count V charged all five appellants with possession and distribution arising from the sale to Goodowens on January 20, 1984.

Carlin was convicted on all five counts of the indictment. Bottari and Sweigart were convicted on counts I and V. Both Padin and Pettigrew were convicted on the conspiracy count, but were acquitted on all other substantive charges.

On appeal, appellant Padin charged that the district court erred in failing to suppress the incriminating statements he made via the telephone subsequent to the government's entry into the Skippy Street house, but prior to the issuance of the search warrant. The district court denied appellant's motion to suppress, concluding that Padin had failed to demonstrate a reasonable expectation of privacy in the telephone conversation at issue.

In his motion to suppress, Padin admitted that he had not resided at Skippy Street for "a substantial period of time" prior to the January 20, 1983 warrantless entry and that he had "permitted others to reside in said premises and to have primary control thereof." Padin asserted that because of his retained right of entry and possession insured by his leasehold interest and because the listing to the telephone at Skippy Street continued in his name, he had an ongoing reasonable expectation of privacy in the premises and the interception of his telephone calls constituted a "search"

---

2. Padin was known to members of the IHMC as "Fast Eddie".

which infringed his Fourth Amendment rights.

The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. In *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the court delineated the elements to be considered in determining whether police conduct resulted in a Fourth Amendment "search."

In *Katz*, government agents had intercepted a telephone conversation by attaching an electronic listening device to the outside of a public phone booth. The Court rejected the government's argument that a "search" had not occurred because there had not been a physical intrusion into a "constitutionally protected area", stating:

[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. See *Lewis v. United States*, 385 U.S. 206, 210, 87 S.Ct. 424, 427, 17 L.Ed.2d 312; *United States v. Lee*, 274 U.S. 559, 563, 47 S.Ct. 746, 748, 71 L.Ed. 1202. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. See *Rios v. United States*, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688; Ex parte *Jackson*, 6 Otto 727, 96 U.S. 727, 733, 24 L.Ed. 877.

*Katz*, 389 U.S. at 351–52, 88 S.Ct. at 511. In defining the criteria to be applied in determining whether a Fourth Amendment "search" had taken place, the Court concluded that governmental intrusion would constitute a search and seizure within the Fourth Amendment only if it "violated the privacy upon which [the defendant] justifiably relied." *Katz*, 389 U.S. at 353, 88 S.Ct. at 512.

In *Smith v. Maryland*, 442 U.S. 735, 740–41, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979), the Court noted that an evaluation of governmental action asserted to have impinged upon an individual's reasonable expectation of privacy embraced consideration of two discrete questions:

The first is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy," 389 U.S., at 361, 88 S.Ct., at 516—whether, in the words of the *Katz* majority, the individual has shown that "he seeks to preserve [something] as private." *Id.*, at 351, 88 S.Ct., at 511. The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable,'" *id.*, at 361, 88 S.Ct. at 516—whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is "justifiable" under the circumstances. *Id.*, at 353, 88 S.Ct., 512. *See Rakas v. Illinois*, 439 U.S. [128] at 143–144 n. 12, 99 S.Ct. [421] at 430 [–431 n. 12, 58 L.Ed.2d 387 (1978)] *id.*, at 1512, 99 S.Ct., at 434 (concurring opinion); *United States v. White*, 401 U.S., [745] at 752, 91 S.Ct. [1122] at 1126 [28 L.Ed.2d 453 (1971)] (plurality opinion).

*See also United States v. Knotts*, 460 U.S. 276, 103 S.Ct. 1081, 1085, 75 L.Ed.2d 55 (1983).

In the present case, Padin urged that he exhibited a reasonable expectation of privacy when he telephoned the Skippy House because of his leasehold interest in the premises and the telephone directory listing that he had retained in his name and the ultimate control he asserted over the premises, albeit as an absentee landlord. The government argued that since Padin failed to determine the identity of the answering individual before he voluntarily communicated his incriminating statements and had abandoned all objective precautionary safeguards which would have manifested his intent to protect the privacy of the conversation, he had not supported his asserted subjective expectation of privacy to the conversation.

It should also be noted that although Padin attempted to characterize Skippy House as his "home", the Skippy Street residence was not his residence. Rather, Padin had moved from the house approxi-

mately two months before the date of the search and had relinquished control of the premises to others. In addition to its use as a temporary residence for several gang members, Skippy Street was used as a drug distribution center. Because Padin had relinquished control over Skippy Street to various gang members, knew that the facility was being used as a drug distribution center, and, in the face of that knowledge, failed to determine the identity of his telephone conversationalist or impose any precautions calculated to ensure the confidentiality of the conversation at issue, this court cannot conclude that he exhibited a subjective expectation of privacy in the incriminating telephone conversation.

■ Moreover, even assuming arguendo that Padin had established a subjective expectation of privacy in the controversial telephone conversation, such an expectation could not be characterized as "one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). In determining whether an asserted privacy interest in a telephone conversation is reasonable, the court must consider the objective realities of the circumstances attendant to the conversation at issue and balance the probability of maintaining the confidentiality between the parties to the conversation against the probability of a violation of the privacy intended to attach to the conversation by a disclosure to others.

In *United States v. Santillo*, 507 F.2d 629 (3d Cir.1975) the Court indicated that the relationship between the parties to the conversation was one factor to be judged in evaluating the potential for a violation of confidentiality. Noting that "[t]he possibility of repetition is a well-known risk that the prudent man weighs before disclosing confidential information", the court refused to suppress a conversation between the defendant and an undercover federal agent because there existed between the two only a casual relationship. *Id.* at 631.

Correspondingly, the operative facts of the case at bar militate against a conclusion that Padin's expectation of privacy was reasonable under the attendant circumstances and this court concludes that it was unreasonable for Padin to attach an expectation of privacy to an indiscreet and incriminating conversation with an unidentified telephone conversationalist who accepted the call at a house known by him, Padin, to be a drug distribution center frequented by innumerable gang members and transient visitors.

Appellants also argued that the district court abused its discretion by reading excerpts of McCloud's direct testimony to the jury in response to its two written inquiries. On the second day of jury deliberations, the jury requested to review certain testimony given by McCloud which related to a "ringer." While the court was discussing the first inquiry with counsel, the jury submitted a second written inquiry to the court. After conferring with counsel, the court read that part of McCloud's direct testimony dealing with a "ringer" to which appellants, on appeal, assigned error.

■ In reviewing a district court's decision to read testimony to the jury, this court is bound by an abuse of discretion standard. As this court noted in *United States v. Licavoli*, 725 F.2d 1040, 1049 (6th Cir.1984), *cert. denied*, 467 U.S. 1252, 104 S.Ct. 3535, 82 L.Ed.2d 840 "[i]t is within the judge's discretion to re-read testimony for a deliberating jury." In exercising that discretion, the court "can and should take into consideration the reasonableness of the jury's request and the difficulty of complying therewith." *United States v. Almonte*, 594 F.2d 261, 265 (1st Cir.1979).

Reported cases recognize two inherent dangers in reading testimony to a jury during its deliberations. First, undue emphasis may be accorded such testimony. *United States v. Varsalona*, 710 F.2d 418, 421 (8th Cir.1983); *United States v. Nolan*, 700 F.2d 479, 486 (9th Cir.1983), *cert. denied*, 462 U.S. 1123, 103 S.Ct. 3095, 77 L.Ed.2d 1354 (1983). Second, the limited testimony that is reviewed may be taken out of context by the jury. *See, e.g., Government of Canal Zone v. Scott*, 502 F.2d 566, 570 (5th Cir.1974). In *Henry v.*

*United States,* 204 F.2d 817 (6th Cir.1953), this circuit noted that these concerns are escalated after the jury had reported its inability to arrive at a verdict. In *Henry,* the court granted the jury's request to re-hear the recorded testimony of a number of witnesses. However, included in the mechanical replay of defendant's testimony were comments of the trial judge expresing his belief that the witnesses were testifying falsely. This court reversed and remanded the case for retrial, finding that the judge's comments could have influenced the guilty verdict. The *Henry* court stated at 820–21:

> After the jury has reported its inability to agree upon a verdict, it is, in our opinion, encumbent upon the trial judge to exercise extreme care in reopening the case for the introduction of further testimony or in permitting any evidence to be restated or re-read to the jurors. Unless restraint is exercised by the judge, it may well be that he would permit undue emphasis to be placed upon portions of the testimony, if such portions were called for by the jurors.

▪ In the case at bar, the trial court examined the transcript and determined that specific and limited excerpts of McCloud's testimony responded to the jury's request. In the light of the foregoing, this court cannot conclude that the district court abused its discretion in complying with the jury's request.

▪ Appellants Padin, Carlin, Sweigart, and Bottari also asserted that the district court erred in denying their Jencks Act request for production of DEA agent Sprague's debriefing report summarizing the McCloud interview. The Jencks Act, 18 U.S.C. § 3500, requires that, upon the motion of a defendant, the government must provide the defense with prior statements of testifying government witnesses which relate to the subject matter of the witness' testimony. 18 U.S.C. § 3500(b). The term "statement" is specifically defined in the Act:

> (e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—
>
> (1) a written statement made by said witness and signed or otherwise adopted or approved by him;
>
> (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
>
> (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

Appellants argued that the debriefing report prepared by Sprague qualified as a "statement[s]" for two reasons. First, appellants suggested that the Sprague report qualified as a "substantially verbatim recital" of McCloud's statements to him as defined in 18 U.S.C. § 3500(e)(2). Second, appellants asserted that the Sprague report was "otherwise adopted or approved" by McCloud as defined in 18 U.S.C. § 3500(e)(1).

The Jencks Act was enacted in response to a fear that the Supreme Court's decision in *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957) would be interpreted to "compel the undiscriminating production of agents' summaries of interviews regardless of their character or completeness." *Palermo v. United States,* 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1957). In *Palermo,* the Supreme Court determined that in enacting the Jencks Act, Congress did not intend to permit the defense to indiscriminately impeach witnesses with statements which "could not fairly be said to be the witnesses' own words rather than the product of the investigator's selections, interpretations, and interpolations." 360 U.S. at 350, 79 S.Ct. at 1223. Rather, the *Palermo* Court concluded that the Jencks Act was directed to production of undistorted statements "which could properly be called the witness' own words." *Id.* at 352, 79 S.Ct. at 1224. Expressing its concerns, the Court stated that "[d]istor-

tion can be the product of selectivity as well as the conscious or inadvertent infusion of the recorder's opinions or impressions." *Id.*

Sprague's debriefing report did not meet the *Palermo* standard prerequisite for production. His testimony at the suppression hearing clearly disclosed that he exercised editorial discretion by recording only those segments of McCloud's interview to which he assigned importance and relevance in lieu of a verbatim record of the interview.[3]

Appellants would also qualify Sprague's work product as Jencks Act material because it was "signed or otherwise adopted or approved" by McCloud. The evidence disclosed that McCloud did not read or sign the report or was it ever read to her. Moreover, the statement cannot be considered to have been "adopted" by McCloud for the purposes of the Jencks Act since she was unfamiliar with its content and had not affirmatively approved it. *See, e.g., Goldberg v. United States,* 425 U.S. 94, 110 n. 19, 96 S.Ct. 1338, 1348 n. 19, 47 L.Ed.2d 603 (The adoption requirement "clearly is not met when the lawyer does not read back, or the witness does not read, what the lawyer has written."). This court accordingly is of the opinion that McCloud did not clearly and unambiguously adopt the report since she neither signed, read, nor had it read to her.

Appellants Carlin and Sweigart charged the district court with an abuse of discretion in denying them the opportunity to effectively cross-examine government witness Christine Smock on issues of motive and bias. Smock lived at the Skippy Street house and was the girlfriend of appellant

Sweigart. Her mother, Jamie McCloud, was also a witness for the prosecution.

Smock was named in the indictment and pleaded guilty to the charge of conspiracy. At trial, Smock was exhaustively cross-examined about her involvement in the conspiracy, her guilty plea and the details of her plea bargaining agreement. Smock admitted that she had sold cocaine, that she pled guilty to one count of the indictment, and that the prosecution had agreed not to oppose her probation or to charge her as a fugitive upon her failure to appear in response to the indictment issued against her.[4]

Counsel for appellants Carlin and Sweigart attempted, on cross-examination, to impeach Smock's credibility by demonstrating that her trial testimony was motivated by a desire to protect her mother's plea agreement from jeopardy. However, the evidence disclosed that she had not seen her mother in eight months and that she had no detailed knowledge of her mother's plea arrangement.

■ This circuit has emphasized that "cross-examination is a matter of right" and that the cross-examiner "must be given 'reasonable latitude' in developing facts tending to show that the testimony in chief was untrue or biased." *United States v. Touchstone,* 726 F.2d 1116, 1122 (6th Cir. 1984) (*quoting Alford v. United States,* 282 U.S. 687, 690, 51 S.Ct. 218, 219, 75 L.Ed. 624 (1931)). Despite the wide latitude to be accorded the right of cross-examination, the scope of cross-examination, nevertheless, is within the sound discretion of the trial judge. *Touchstone* at 1122.

---

3. An *en camera* inspection of Sprague's debriefing report of the McCloud interview verified his suppression hearing testimony concerning the manner in which he composed the report. Moreover, the report disclosed no exculpatory material which the government would have been obliged to produce pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Upon this court's review of the controversial *en camera* documents, this court concurs with the refusal of the trial court to order the production of the material here in issue.

This court's *en camera* review of Kresser's statements made to investigatory agents confirmed that those statements contained no producible Jencks or Brady material.

It should also be noted that the U.S. Attorney professionally represented to this court that government files did not include notes or debriefing reports relating to any interview with Ladd.

4. Following the initial arrests of the Skippy Street conspirators, Smock fled from the Memphis area. She was eventually arrested in Fort Lauderdale, Florida and returned to Memphis.

Upon consideration of the record herein, this court concludes that the district court did not abuse its discretion in limiting the cross-examination undertaken by defendants Carlin and Sweigart. The proffered interrogation was directed to elicit information beyond the knowledge of the witness. Moreover, the permitted exhaustive cross-examination of Smock in all areas of her involvement in the conspiracy and the details of her own plea arrangement provided the jury with sufficient information to evaluate her credibility.

Appellants Sweigart and Carlin also challenged the trial court's ruling in permitting the government to identify the defendants and other members of the conspiracy by alluding to their respective nicknames. The gravamen of this assignment of error was that the court permitted prejudicial evidence of the appellants' lifestyles as members of a motorcycle gang to adversely influence the jury. However, the evidence developed during trial disclosed that the method of identification employed by the government was essential because it was, in some instances, the only means available to the government to identify certain individuals whose actual names were unknown to witnesses. *Cf. United States v. Hattaway,* 740 F.2d 1419, 1425 (7th Cir.) *cert. denied,* —— U.S. ——, 105 S.Ct. 448, 83 L.Ed.2d 708 (1984) (Forbidding witness to use nicknames would have placed undue burden on her testimony).

Appellants Carlin and Sweigart also took exception to the introduction of their arrest photos asserting that the photos permitted the jury to visualize the defendants in their true character and as they appeared when arrested, thereby affording the prosecution the opportunity to depict them as Charles Manson-type bikers. However, as the Fifth Circuit noted in *United States v. Cochran,* 697 F.2d 600, 608 (5th Cir.1983), "when a defendant appears at trial dressed in his Sunday best the prosecutor is entitled to show his appearance when arrested."

The remaining assignments of error advanced by the appellants are without substance and do not warrant comment.

For the reasons stated above, the judgment of the district court is hereby AFFIRMED.