[No. 22849-1-II. Division Two. September 1, 2000.]

THE STATE OF WASHINGTON, *Respondent*, v. MATTHEW WAYNE KOONTZ, *Appellant*.

*Suzan L. Clark*, for appellant (appointed counsel for appeal).

*Arthur D. Curtis, Prosecuting Attorney*, and *Kelli E. Osler, Deputy*, for respondent.

Hunt, A.C.J. — Matthew Koontz appeals his conviction for second degree assault of a child. He argues the trial court erred in (1) allowing the jury to review videotape recordings of three trial witnesses; (2) denying his motion for a mistrial based on ineffective assistance of counsel; and (3) imposing an exceptional sentence. We affirm.

## FACTS

Judyann Henderson provided day care for 10-month-old Summer Harkless. On April 30, 1997, Summer's father brought her to Henderson's day care. Summer was uninjured at that time and at 11:30, when Henderson laid her down for a nap. Between 11:30 and 12:10, only Henderson, Koontz, and Koontz's two-year-old daughter went into the bedroom where Summer was sleeping. At 12:10, Henderson heard Summer crying, entered the bedroom, and found her injured. Henderson, Koontz, and Tamara Koontz all denied causing the injuries. Henderson called Summer's mother, Shelly Harkless.

When Harkless arrived, she saw Tamara Koontz holding Summer on the couch. Harkless described her daughter's condition as follows:

> The whole right side of her face was all swollen and bloodshot looking. I didn't notice any blood or anything, just her whole right eye was swollen, her face was just totally disformed and swollen.

Tamara was quiet, crying, and would not look at Harkless. Henderson was in the kitchen, crying hysterically and apologizing profusely. Angry, Matthew Koontz told Henderson not to say what she was saying.

Henderson told Harkless she thought that Summer had had a panic attack and had thrown herself against the crib, as evidenced by a broken crib slat lying on the bed. At trial, Henderson testified that she went to the bathroom at 12:02 and passed by the bedroom where Summer was sleeping; she saw Koontz in the bedroom with his two-year-old daughter, helping her get a pair of socks; and when she left

the bathroom, Koontz was not in the bedroom and Summer was sleeping and uninjured.

Tamara Koontz testified that at 12:10, she passed Henderson in the hallway on her way into the bedroom to retrieve Summer, who was crying; and she heard Henderson yell out, "Oh, my God, Summer's got scratches on her face. . . . Please come here, you guys, and look at this." One of the children from the day care, six-year-old Steven Forjette, testified that he saw Koontz go into the bedroom by himself and that Summer was crying when Koontz came out of the bedroom. He also saw Henderson go in and retrieve Summer, and when she brought her out, Summer had marks on her face.

Shelly and Henderson took Summer to the Southwest Washington Medical Center, where she was examined by Dr. Peter Stich. Dr. Stich diagnosed Summer as suffering from a skull fracture with an underlying subdural hematoma. He characterized the injuries as nonaccidental and impossible for Summer to have self-inflicted. He found her injuries indicative of a blow to the head. Later examination also revealed that Summer had a fractured tibia in her left leg, multiple bruises, a missing left incisor, a torn frenulum,[1] contusions, and swelling of the jaw on the right side and into the scalp, a one-inch straightedge laceration on the right side of the frontal scalp, and scattered contusions on the right parietal and left parietal scalp and face as well as the occiput.[2]

Dr. John Stirling did a follow-up examination of Summer about a month later and also described the impossibility that Summer's injuries were accidental:

> The fracture to the skull is back here. The missing tooth is over here. The bruises to the eye are up here. You've got bruises on the left side of the head, bruises on the right side of the head,

---

[1] A small "reflection or fold of mucous membrane passing from a more fixed to a movable part, serving to check undue movement of the part," STEDMAN'S MEDICAL DICTIONARY 690 (Marjory Spraycar ed., 26th ed. 1995), "as the underside of the tongue," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 909 (1969).

[2] "The back of the head." STEDMAN'S MEDICAL DICTIONARY at 1236.

a fractured skull in the back of the head, a missing tooth in the front of the head.

And it is inconceivable to me that that child, this ten-month-old child who does not walk, could have stumbled somehow into an accidental injury and caused that to herself, or that she could have sustained a single blow, as by a fall or something of that nature, and sustained all those injuries. It makes no sense.

. . . .

This child was struck with considerable force a number of times.

. . . .

[T]he major injuries that I've described to you appeared to have occurred at the same time.

As to Summer's fractured tibia, Dr. Stirling explained:

When people assault a child of this size, they frequently do so by lifting the child by an extremity, and sometimes the twisting forces by lifting the child by a leg or an arm are sufficient to break the bone, and you'll get a spiral fracture from that.

I see these happen accidentally. The other way one gets a fracture like that is you can get your leg caught in a railing or a grating or something and fall in such a way as to twist. That usually happens in children who are walking.

. . . .

We would say that it's suspicious for an abusive injury, but would stop at saying that it was diagnostic. It doesn't make a diagnosis of abuse, but we see these kinds of injuries more often with abusive cases.

Officer Maureen Pea-Schuman interviewed Koontz, who stated:

I was only with her twenty minutes. You think I hurt her in only twenty minutes? . . . I can't believe you think I could hurt a kid when I was only in there twenty minutes.

Detective Steve Norton also heard Koontz make these statements. At trial, Koontz testified that he did not recall making the "twenty minutes" statements and that he had been in the bedroom for only 20 seconds to retrieve a pair of socks for his daughter.

Before closing argument, Koontz sent a letter to the trial court judge raising concerns about the adequacy of his trial counsel's representation. The trial judge spoke with Koontz, listened to his concerns, clarified that he was asking for a new attorney and a new trial, spoke with defense counsel, and then denied the motion.

The jury was unable to agree on whether Koontz had assaulted Summer. They sent a note to the trial judge asking if they could watch the testimony of Koontz, Henderson, and Forjette. The trial judge initially denied the request. The jury sent another note, which said they were deadlocked. The trial judge spoke with the jury foreperson and asked him to return to the jury and to determine if they were truly deadlocked. When the foreperson returned, he explained:

> [T]he jurors basically feel like without more information or reviewing testimony or any of that, they don't feel that they can at this time or a later time come out of their deadlock.

The foreperson again requested the videotaped testimony of the same three witnesses to help the jurors' discussion and to "get facial expressions and whatnot," and to help resolve the "discrepancy between what was indeed said and what wasn't said." Following argument by counsel, the trial court replayed the entire testimonies of all three witnesses, without interruption, in the courtroom, in the presence of counsel and Koontz.[3] The jury then returned a guilty verdict.

Following a hearing, the trial court found that an exceptional sentence was warranted based on Summer's particu-

---

[3] Before replaying the testimony, the trial court informed counsel that it intended to give the following instruction to the jury:

> [B]y allowing you to review the testimony of three witnesses, Judyann Henderson, Steven Forjette and Matthew Koontz, I am not suggesting that you should place undue emphasis on the testimony of any of those three witnesses.
>
> You are to decide the case upon fully and fairly considering all of the evidence presented in this case.

But the record before us does not reflect whether this instruction was actually given.

lar vulnerability and her multiple injuries. The standard range sentence for the offense was 31 to 41 months. The court imposed a sentence of 96 months.

## ANALYSIS

### JURY'S REVIEW OF WITNESS TESTIMONY

Koontz argues that the trial court abused its discretion in granting the deadlocked jury's request to view the videotaped testimonies of himself, Henderson, and Forjette. The State argues to the contrary. Both parties agree that no Washington state appellate court has considered this issue. And both argue that two Ninth Circuit Federal Court of Appeals decisions support their respective positions: *United States v. Binder*, 769 F.2d 595 (9th Cir. 1985); and *United States v. Sacco*, 869 F.2d 499 (9th Cir. 1989). These two Ninth Circuit cases apply the same test but reach different results.

In *Binder*, the federal district court replayed testimony of two complaining child witnesses who alleged that Binder had sexually molested them. Binder was not present during the playing of the tape, and the jury was allowed to skip preliminary portions of the testimony. *Binder*, 769 F.2d at 598. The Ninth Circuit reversed, holding:

> Permitting the replay of the videotaped testimony in the jury room during deliberation was equivalent to allowing a live witness to testify a second time in the jury room. *The same consideration and procedures should be employed for videotaped testimony as are employed in the rereading of live testimony.* If it is appropriate to allow the jury to hear the testimony of a witness a second time at all, the *preferred procedure* would require the preparation of *a transcript of videotaped testimony* and a *rereading of that testimony to the jury in the courtroom with all parties present.*

*Id.* at 601 n.1 (emphasis added). The Ninth Circuit also criticized allowing the jury to replay the tape in an abridged

fashion because this may have unduly emphasized that replayed portion.[4] *Id.* at 601.

In *United States v. Sacco*, the Ninth Circuit held that the district court did not abuse its discretion in allowing a second viewing of a videotaped deposition of a prosecution witness, distinguishing *Binder* because of (1) the quantum of other evidence against the defendant; (2) the importance of the videotaped testimony in relation to other evidence; and (3) the manner in which the videotape was replayed. The Ninth Circuit found ample physical evidence of Sacco's criminal conduct, Sacco did not testify, his credibility was not at issue, and the videotaped testimony did not directly conflict with that of other witnesses. *Sacco*, 869 F.2d at 502. The Ninth Circuit explained:

> In *Binder*, the court never consulted either counsel or the defendant with regard to the jury's requests to replay the tape and to do so selectively. We did not reach this issue because we found the replay erroneous on other grounds. *Here, by contrast, the court notified Sacco, his counsel, and the government of the jury's request.* The court afforded both sides the opportunity to object. Sacco's counsel was allowed to specify the precise testimony the jury might unduly emphasize and to suggest alternatives. The district court ultimately disagreed with counsel's arguments predicting undue emphasis, and rejected the proposed alternatives. Still, these procedures indicate that *the district court reached its decision after careful consideration.* We conclude that the particular facts and circumstances of this case indicate that the district court did not abuse its discretion.

Id. at 503 (citations omitted) (emphasis added).

 Our case is more akin to *Sacco* than to *Binder*. Here, the trial court carefully considered the issue, invited briefing and argument, listened to arguments, and granted the jury's repeated request only because without replaying the tapes, a deadlock was inevitable. Although the evidence against Koontz was circumstantial and the jury's decision

---

[4] Central to the court's reversal was that the jury reviewed the testimonies of only the child victims, which the Ninth Circuit felt allowed unfair repetition of the government's case against Binder. *Binder*, 769 F.2d at 601.

turned on the credibility of the witnesses, the manner in which the court replayed the videotape did not overemphasize any particular witness. Specifically, replaying Henderson's testimony, which was exculpatory, and Koontz's testimony, which was also exculpatory, tempered any prejudice that may have occurred from replaying Forjette's testimony, which was inculpatory. Furthermore, the trial court replayed the tapes in their entirety, without interruption, in open court, with counsel and the defendant present. Unlike the facts in *Binder*, here the jury had no opportunity to stop, to replay, or to discuss the videotaped testimonies as they watched and listened.

We analogize to the well-established practice of allowing trial courts broad discretion in responding to jury requests to read back testimony.[5] The challenges in these cases usually focus on

> two inherent dangers in reading testimony to a jury during its deliberations. First, undue emphasis may be accorded such testimony. Second, the limited testimony that is reviewed may be taken out of context by the jury.

*United States v. Padin*, 787 F.2d 1071, 1076 (6th Cir. 1986) (citations omitted). But so long as the trial court undertakes measures to ensure the jury does not improperly evaluate the reread testimony, there is no abuse of discretion. *United States v. Tines*, 70 F.3d 891, 897-98 (6th Cir. 1995).

Insofar as Koontz objects to the videotape medium of

---

[5] *See, e.g., State v. Colson*, 9 Wn.2d 424, 428, 115 P.2d 677 (1941); *accord United States v. Sandoval*, 990 F.2d 481, 486-87 (9th Cir. 1993) (trial judge did not abuse discretion in permitting defendant's testimony to be read to jurors during deliberations; trial judge consulted with counsel before exercising his discretion, cautioned the jurors to determine guilt or innocence based on entirety of the evidence, and offered to have entire testimony read if jurors requested it).

*See* generally 75B Am. Jur. 2d *Trial* § 1685, at 467 (1992) (collecting cases and noting that "justice is more likely to be promoted than obstructed if the jury is allowed to rehear specific testimony given at the trial") and L.S. Tellier, Annotation, *Right to Have Reporter's Notes Read to Jury*, 50 A.L.R.2d 176, 178 (1956) (observing that "the vast majority of the cases, both criminal and civil, adhere to the view that it is proper to read [reporter's] notes to the jury, but that there is no absolute right with regard thereto, or any requirement that requests for such reading must under all circumstances be rejected").

replaying testimony for the jury, we reject his argument. Replaying the videotaped testimony was a more accurate method of reproducing the witnesses' testimonies than was the formerly used method by which the court reporter read back the testimony to the jury.

We cannot say the trial court here acted without reason or that no other reasonable judge would have reached the same conclusion. The trial court here was appropriately cautious in responding to the jury's repeated request. We hold that the trial court did not abuse its discretion.

Affirmed.

MORGAN and BRIDGEWATER, JJ., concur.

Review granted at 143 Wn.2d 1020 (2001).