*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0353p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

　　　　　　　*Plaintiff-Appellee,*

　　*v.*

MARVIN SMITH,

　　　　　　　*Defendant-Appellant.*

No. 04-1476

>

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 90-80445—Patrick J. Duggan, District Judge.

Argued: July 22, 2005

Decided and Filed: August 18, 2005

Before: KENNEDY, CLAY, and GILMAN, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Scott A. Srebnick, Miami, Florida, for Appellant. Robert Cares, UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Scott A. Srebnick, Miami, Florida, for Appellant. Robert Cares, UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. Marvin Smith, the delivery man for a drug-trafficking ring operating out of a Detroit car wash, was indicted in 1990 on charges that he conspired to possess and did possess 32 kilograms of powder cocaine with the intent to distribute, engaged in interstate travel in aid of racketeering, and unlawfully used a communication device. Shortly before the jury convicted Smith on all counts, he absconded. He was not apprehended until 12 years later. The district court, in 2004, sentenced him to 240 months in prison.

On appeal, Smith argues that the district court erred in (1) admitting into evidence the grand jury testimony of an important prosecution witness and then providing the transcript to the petit jury in the absence of a cautionary instruction, (2) reading the indictment against Smith to the jury and then sending it to the jury room without a proper limiting instruction, and (3) enhancing Smith's sentence on the basis of judge-found facts in violation of *United States v. Booker*, 125 S. Ct. 738 (2005). For the reasons set forth below, we **AFFIRM** the judgment of the district court.

1

## I. BACKGROUND

### A.    The drug-trafficking operation

Agents from the Federal Bureau of Investigation (FBI) raided June's Car Wash in Detroit, Michigan on the evening of July 11, 1989 and seized 32 kilograms of high-quality powder cocaine. The evidence that led to this investigation was primarily obtained through FBI wiretaps on three telephone lines. Two of the telephone lines were located at the car wash and the other was located at the home of Joseph Moss, one of the car wash's co-owners.

Calls that were intercepted on these lines in June of 1989 alerted FBI agents to the fact that a man in California, referred to alternatively as "Pops," "Bishop," and "Pops Bishop," was trying to make a large purchase of cocaine that he planned to deliver to the car wash. Smith admitted in a 1990 interview with an FBI agent that he had "used the name Bishop all his life," and "that people call him Pops." Furthermore, a voice exemplar taken from Smith matched the voice of the man in these intercepted calls.

During one of the June telephone conversations between Smith and Roosevelt Lockett, the other co-owner of the car wash, Smith advised that "whatever move I make right now is gonna be damn near big enough to hold us the summer." Lockett said to Smith, in a conversation later that day: "I'm sending you the seven." Moss sent a money order in the amount of $7,000 to California less than three hours later. It was payable to "Marvin Smith."

A month after this, another series of conversations intercepted on the phone lines suggested to agents that the car wash was expecting a large quantity of cocaine to be delivered in the near future. On July 10, 1989, Patricia McKenzie, also a member of the drug-trafficking ring, assured Moss that Smith would soon be making a delivery. McKenzie told Moss: "Okay. I talked to Pops and he called me twice yesterday. . . [and] he said it might be today." The next day, on July 11, 1989, Smith called Moss and advised him that "the front man's here so we talkin' about between three and six." At approximately 6:00 p.m., Smith called Moss at the car wash and asked, "Anybody in my parkin' spot?" Moss replied, "No." And Smith told him to "leave the door open."

FBI agents conducting surveillance on the car wash saw a red car arrive and then back into the wash bay nearest the office. Unlike the other cars that the agents had seen entering the bays, this car was not washed. (Three of the young men who were working at the car wash that day later testified that Moss had instructed them not to wash this particular car.) After backing the car in, the driver got out and opened the trunk. Moss and others were then seen taking boxes out of the trunk and carrying them to the office. As soon as the unloading was finished, the driver got back in the red car and drove away from the car wash. The car was followed by FBI agents, who obtained its license number, but never stopped the car. (In its brief, the government suggests that this was because the agents "were unable to stop it," but we find no support for this statement in the record.) A few minutes after the red car left the car wash, FBI agents executed a search warrant on the premises and discovered 32 kilograms of high-quality powder cocaine stored in the office.

### B.    Proceedings in the district court

Fourteen people were charged in connection with the drug-trafficking ring operating out of the car wash. Smith was indicted on five counts: conspiracy to possess powder cocaine with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846; possession of 32 kilograms of powder cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1); engaging in interstate travel with the intent to carry on an unlawful activity, in violation of 18 U.S.C. § 1952; and two counts of unlawful use of a communication device, in violation of 21 U.S.C. § 843(b).

In January and February of 1991, Smith was tried along with 11 of his codefendants. The government alleged that Smith was "Pops Bishop," the man who had helped to orchestrate the cocaine purchase and who had driven the red car that delivered the cocaine to the car wash. None of the FBI agents conducting surveillance of the car wash, however, was able to identify Smith as the driver of the car that made the delivery. Three car wash employees who were working on the day of the delivery testified for the prosecution at trial, but they also failed to identify Smith as the driver of the red car. One employee, Carlos Clark, reluctantly admitted that the name of the driver "might have been Pops," and that he "remember[ed] the name." But Clark then insisted that he had never heard the name "Pops Bishop" at the car wash, and said that he could not identify Smith as the driver of the red car.

Because Clark's trial testimony differed from the testimony that he had previously given to the grand jury that indicted Smith, the government was permitted to read Clark's grand jury testimony into the record. *See* Fed. R. Evid. 801(d)(1)(A). The grand jury testimony, in relevant part, read as follows:

Q:	Now, did you recognize the driver of the car?
A:	Yes.
Q:	Had you seen the driver before?
A:	Yes, I saw him before.
Q:	Did you know his name?
A:	No.
Q:	Did you know him by a nickname?
A:	I think I heard of his nickname.
Q:	What was his nickname?
A:	I think it's Pops.
Q:	Pops?
A:	Yes.
	. . .
Q:	He had been to the car wash before? You'd seen him there before?
A:	Right.
	. . .
Q:	Did you ever hear of a person by the name of Pops Bishop?
A:	I think that's him.
Q:	He was in the red car . . ., is that right?
A:	Right.

In addition to reading this testimony into the record, the district court permitted the government to introduce a transcript of Clark's grand jury testimony as an exhibit. Later, the jury was permitted to view this exhibit during its deliberations.

Smith failed to appear for court on February 6, 1991, which was after the jury had begun its deliberations but two days before it found him guilty on all five counts. He remained a fugitive for 12 years. Smith was finally apprehended in Mexico in March of 2003. In 2004, the district court sentenced Smith to 240 months in prison. This timely appeal followed.

## II. ANALYSIS

### A.        The fugitive disentitlement doctrine

This case presents the difficult question of whether we should employ the fugitive disentitlement doctrine to dismiss Smith's appeal from his conviction. Courts have used this doctrine to dismiss the appeals of defendants whose flights "operate[] as an affront to the dignity of the court's proceedings" or "so delay the onset of appellate proceedings that the Government would be prejudiced in locating witnesses and presenting evidence at retrial after a successful appeal." *Ortega-Rodriguez v. United States*, 507 U.S. 234, 246, 249 (1993). The government argues that Smith's appeal from his conviction should be dismissed because his 12-year flight from justice has prejudiced the government's ability to retry him in the event that we set aside his 1991 conviction.

A review of the caselaw reveals that this court and courts in many of our sister circuits have applied the doctrine in circumstances similar to the present appeal. *See, e.g., United States v. Genoa*, No. 93-2292, 1995 WL 73291, at *4 (6th Cir. Feb. 22, 1995) (unpublished) (dismissing the appeal of a defendant who was a fugitive for three years because his appeal could not be consolidated with his codefendants' appeals, "constitut[ing] a significant interference with the substantial interests of the appellate process"); *United States v. Sudthisa-Ard*, 17 F.3d 1205 (9th Cir. 1994) (applying the doctrine to dismiss the appeal of a defendant who had been a fugitive for thirteen years); *United States v. Bravo*, 10 F.3d 79 (2d Cir. 1993) (dismissing the appeal of a defendant who was a fugitive for fifteen years).

All of the above cases, however, were decided prior to the Supreme Court's ruling in *United States v. Degen*, 517 U.S. 820 (1996). In *Degen*, the Supreme Court refused to apply the disentitlement doctrine, "counsel[ing] restraint in resorting" to "the harsh sanction of absolute disentitlement." *Id.* at 823, 827. It further warned that "the sanction of disentitlement is most severe and so could disserve the dignitary purposes for which it is invoked" because the respect accorded to a court's judgment "is eroded, not enhanced, by too free a recourse to rules foreclosing consideration of claims on the merits." *Id.* at 828.

The Supreme Court's admonition was heeded by this court in two post-*Degen* cases where the government sought to invoke the fugitive disentitlement doctrine. One of these cases is *Brown v. O'Dea*, 187 F.3d 572 (6th Cir. 1999), where the court reached the merits of the defendant's claims on appeal despite his being a fugitive for more than ten years. Judge Moore explained in her concurring opinion that refusing to apply the fugitive disentitlement doctrine was appropriate "[i]n light of the Supreme Court's recent warnings against using our inherent power to control our docket as a tool for inflicting ad hoc punishment." *Id.* at 584 (Moore, J., concurring). The other case is *March v. Levine*, 249 F.3d 462, 470 (6th Cir. 2001), where the court also refused to dismiss a former fugitive's appeal, and it did so in explicit reliance on "the *Degen* Court's guidance to courts in deciding whether to disentitle a claimant."

Nevertheless, the Supreme Court was clear in *Degen* that the dismissal of an appeal pursuant to the fugitive disentitlement doctrine may be appropriate where there is a genuine risk "of delay or frustration" of the government's case against a defendant. 517 U.S. at 825. In the present appeal, the government has alleged that "Smith's absence for twelve years makes it virtually impossible for the government to retry the case." To support this contention, the government states that one of Smith's codefendants has died, the FBI agent who managed the case has retired, "some of the physical evidence may have been destroyed," and "it is probable that not all of the witnesses could even be located."

But these conclusory and hypothetical statements alone are insufficient to trigger "the harsh sanction of absolute disentitlement." *Degen*, 517 U.S. at 827. An evidentiary hearing in the district

court would therefore be necessary to determine whether the government would in fact be prejudiced by a retrial of Smith's case. Rather than undergo such a process, however, we can avoid having to deal any further with the government's contention on this issue if we conclude that the district court committed no reversible error during Smith's 1991 trial.

**B.    Clark's grand jury testimony**

*1.     Admitting the transcript of Clark's testimony as an exhibit*

Clark told the grand jury that he recognized the man who delivered the cocaine as "Pops Bishop," but, when he was called to testify at Smith's trial, Clark denied any such knowledge. He instead insisted that he had never heard the name "Pops Bishop" at the car wash and could not identify Smith as the driver of the red car. Under such circumstances, the admission of Clark's grand jury testimony was appropriate. *See United States v. Distler*, 671 F.2d 954, 958 (6th Cir. 1981) (approving of the admission of grand jury testimony after "many of the witnesses forgot portions of their grand jury testimony or remembered it with less certainty of detail").

Smith does not argue that the district court erred in permitting the government to read excerpts of Clark's grand jury testimony to the jury in the present case. Nor does he contend that this testimony may not be considered as substantive evidence of his guilt. Smith does insist, however, that the district court erred in admitting the transcript as an exhibit and thereafter providing a copy of the transcript to the jury. He argues that providing the testimony "in black and white" as an exhibit had the effect of encouraging the jury to place undue weight on the grand jury testimony relative to the other testimony offered at trial. *See United States v. Walker*, 1 F.3d 423, 430 (6th Cir. 1993) ("The potential for double exposure to selected testimony to improperly influence a jury has long been recognized."). Because Smith preserved his objection to the district court's admission of the transcript as an exhibit, we review its actions under the abuse-of-discretion standard. *See United States v. West*, 948 F.2d 1042, 1044 (6th Cir.1991) (holding that the decision to admit transcripts of taped testimony into evidence, or to send transcripts to the jury for their reference, falls within the sound discretion of the trial court).

If the transcript of Clark's grand jury testimony had been sent to the petit jury after the district court had determined that such action was necessary and after the court had given an appropriate limiting instruction, there can be little doubt that the district court would not have abused its discretion in permitting the deliberating jury to view the transcript. *See United States v. Scaife*, 749 F.2d 338, 347 (6th Cir. 1984) ("A district court has broad discretion to permit a jury to take to the jury room any tape recordings that have been admitted as exhibits during trial."). Whether the transcript was properly admitted as an exhibit, however, is a closer question.

This court was faced with an analogous situation in *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721 (6th Cir. 1994). There, the court warned that a "party's right to admit prior statements in a document for rehabilitative purposes [does not] necessarily entitle[] that party to submit the document as an exhibit to the jury. Permitting the document to go to the jury room could unduly prejudice the cross-examining party." *Id.* at 730 n.2. The *Engebretsen* court advised that the district court should instead "consider admitting the statements in the document through testimony or by having the document read to the jury." *Id.* Only where "the court determines that admitting the document as an exhibit is necessary" should the document be admitted, and then only with an appropriate instruction regarding "the limited purpose of the exhibit." *Id.*

The district court in the present case offered no justification for its decision to eschew the established practice of simply reading the transcript of the testimony aloud to the jury. It made no finding with regard to whether the admission of the transcript as an exhibit was necessary, nor did the court explain its decision to provide the deliberating jury with a copy of the transcript. The failure of the district court to explain its actions regarding the grand jury transcript was an abuse of

discretion. *See Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004) ("At times, we have found an abuse of discretion where a district court fails to explain its reasoning adequately or to consider the competing arguments of the parties."). Nevertheless, because Smith has failed to show that the jury's consideration of the transcript prejudiced his defense (see Part II.B.2.below), any error by the district court would necessarily be harmless. *See Scaife*, 749 F.2d at 347 (ruling that the district court's "technical error" in permitting the deliberating jury to listen to a tape that had not been admitted into evidence was harmless because "the defendants ha[d] not even attempted to show prejudice").

### 2.       *Failing to give the jury a cautionary instruction*

Smith also argues that the district court erred in failing to give a proper cautionary instruction before providing the deliberating jury with a copy of Clark's grand jury testimony. *See United States v. Rodgers*, 109 F.3d 1138, 1141 (6th Cir. 1997) (taking the "opportunity to explicitly announce the rule that a district court must give cautionary instructions to the jury when allowing the jury to review trial testimony, and [warning that] a failure to do so may be reversible error"). This court has recognized that there are "two inherent dangers" in permitting a jury to review testimony offered at trial during its deliberations. *United States v. Padin*, 787 F.2d 1071, 1076 (6th Cir. 1986). First, the jury may accord "undue emphasis" to the testimony it reviews. *Id.* And second, "the limited testimony that is reviewed may be taken out of context by the jury." *Id.* "[T]hese concerns are escalated after the jury ha[s] reported its inability to arrive at a verdict." *Id.* at 1077.

The reported cases addressing when it is appropriate for a deliberating jury to review testimony do not distinguish between a district court's rereading of trial testimony to the jury and providing the jury with transcripts of the testimony. *Compare United States v. Tines*, 70 F.3d 891, 897 (6th Cir. 1995) (applying the two concerns expressed in *Padin* to the district court's decision to read back testimony), *with Rodgers*, 109 F.3d at 1143 (evaluating, in light of *Padin*, the district court's decision to provide the jury with a transcript of testimony). Smith also argues that transcripts of grand jury testimony should be treated differently than transcripts of trial testimony, but the relevant caselaw with respect to this issue does not support such a distinction. *See Distler*, 671 F.2d at 958-59 (permitting the jury to consider both trial testimony and grand jury testimony as substantive evidence of the defendant's guilt).

The district court's primary error, however, was its failure to issue a cautionary instruction before providing the petit jury with a transcript of Clark's grand jury testimony. Such an instruction is necessary "to guard against the dangers of undue emphasis and context." *Tines*, 70 F.3d at 897 (approving the district court's decision to issue a cautionary instruction "[t]wice before and once after the testimony was re-read"). The district court therefore abused its discretion in failing to give an appropriate instruction with regard to the proper use of Clark's grand jury testimony. *See Rodgers*, 109 F.3d at 1141 (holding that a district court commits error when it does not give a cautionary instruction before permitting a deliberating jury to review testimony).

Setting aside the judgment and remanding for a new trial is required, however, only if Smith can show that he was prejudiced by the district court's error. Smith asserts that the jury's request to see the transcript of Clark's grand jury testimony, in the absence of a similar request to review Clark's trial testimony, demonstrates that the jury placed "undue emphasis" on the grand jury testimony. *Padin*, 787 F.2d at 1076. The record reveals, however, that the jury asked to see the grand jury testimony of several witnesses, including that of Clark, just after it began its deliberations. When the court informed the jury that some of the testimony requested did not exist because the witnesses had not all testified before the grand jury, the jury then asked for all of the exhibits in the case to be sent to the jury room. The jury's blanket request to see all of the exhibits at this early stage of its deliberations can hardly be said to constitute strong evidence that the jury

placed undue emphasis on this one exhibit. *See Rodgers*, 109 F.3d at 1144 (concluding that the district court's error in failing to issue a cautionary instruction was harmless where "there [wa]s no indication the jury was having great difficulty agreeing on a unanimous verdict").

Smith further argues that the petit jury necessarily viewed the transcript of Clark's testimony "out of context" because the district court neglected to explain to the jury the ex parte nature of grand jury proceedings. *Id.* at 1143. But the jury in Smith's case had the benefit of seeing Clark testify at trial, which is not always the case when grand jury testimony is admitted as substantive evidence in a criminal trial. *See United States v. Barlow*, 693 F.2d 954, 961 (6th Cir. 1982) (admitting the grand jury testimony of a witness who was unavailable to testify at trial). When testifying at Smith's trial, Clark insisted that he did not know the identity of the person who delivered the cocaine. Clark even accused the prosecutor of twisting his grand jury testimony and said: "You're putting two people's names together. I did not say Pops Bishop."

Clark's interpretation of his own grand jury testimony helped to put the testimony in context for the jury. Furthermore, Clark's willingness to verbally spar with the prosecutor at trial undercuts Smith's contention that Clark was a "young and impressionable witness" who was "spoon fed answers" during his grand jury appearance.

Finally, there was substantial additional evidence introduced at trial, including Smith's numerous recorded telephone calls to his coconspirators, upon which the jury could have properly based its guilty verdict. We therefore conclude that the district court's error in failing to issue a cautionary instruction was harmless because "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999) (finding that an improper jury instruction was a harmless error that did not require reversal of the conviction) (citation and quotation marks omitted); *see also United States v. Pugh*, 405 F.3d 390, 400 (6th Cir. 2005) ("In determining whether an error is harmless, the reviewing court must take account of what the error meant to the jury, not singled out and standing alone, but in relation to all else that happened.") (citation and quotation marks omitted).

## C.     The indictment

### 1.     *Reading the indictment to the jury*

Smith also argues that the district court abused its discretion when it read the indictment against him and his codefendants to the jury. *See United States v. Scales*, 594 F.2d 558, 561-62 (6th Cir. 1979) (reviewing the district court's decision to read aloud and provide copies of the indictment to the jury for an abuse of discretion). Under normal circumstances, we have no doubt that a district court is well within its discretion in deciding to read an indictment to the jury. *See United States v. Maselli*, 534 F.2d 1197, 1202 (6th Cir. 1976) (observing that the practice of reading the indictment aloud helps to inform the jury of the charges against the defendant). In the present case, however, Smith contends that the reading of the indictment was improper because it repeatedly referred to Smith by the alias "Pops Bishop." Whether Smith in fact used this nickname was a contested issue at trial.

Smith, however, failed to contemporaneously object to the district court's reading of the indictment to the jury. His claim must therefore be analyzed under the plain-error standard of review. *See Pugh*, 405 F.3d at 402 ("[F]or us to reverse the ruling of the district court, there must be error, which is plain, which affected the substantial rights of the appellant, and which 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'") (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997) (alternation in original)). At Smith's trial, an FBI agent testified that Smith admitted during an interview that people call him by the names "Pops" and "Bishop." The jury also heard evidence that the FBI had compared a voice exemplar taken from Smith with the voice of the man referred to as "Pops" and "Bishop" in the taped telephone calls, and

determined that the man speaking on the tapes was Smith. Because there was significant evidence that Smith had used the nicknames "Pops" and "Bishop," Smith cannot show that his substantial rights were adversely affected by the district court's reading of the indictment to the jury.

### 2.       *Providing the deliberating jury with a copy of the indictment*

The district court also furnished a copy of the indictment to the jury, and it did so without issuing a limiting instruction. Failure to instruct the jury "to the effect that the indictment is not to be considered evidence of the guilt of the accused" constitutes error. *Scales*, 594 F.2d at 561-62 (stating that "the rule is clear that the trial judge has discretion to submit the indictment to the jury in a criminal case," but only "as long as limiting instructions are given"); *see also United States v. Baker*, 418 F.2d 851, 852-53 (6th Cir. 1969) (per curiam) ("We conclude that it was an abuse of discretion for the trial court to permit these photostatic copies of a document possessing all of the indicia of a formal United States government document . . . to be handed to the jury without a proper explanation of the document and of the purpose of its delivery . . . .").

Smith did not timely object to the district court's failure to offer a limiting instruction. He insists, however, that his claim should be evaluated under the abuse-of-discretion standard rather than the plain-error standard because of the "unique circumstances of this case." Specifically, Smith argues that, before the trial, his attorney brought a motion to strike the name "Pops Bishop" from the indictment. The district court denied the motion by stating that it was "much ado about nothing" because "in my courtroom, the Jury never sees the indictment." But in so ruling, the district court also said: "I have no present intent for the Jury to know that those words are in the indictment. No need to strike them necessarily. Maybe somewhere along the line you will convince me . . . ."

The record reveals that the district court did in fact change its position with respect to whether the jury should be provided with the indictment. At that time, however, Smith failed to raise an objection either to the indictment's use of the nicknames or the district court's failure to issue a limiting instruction to the jury. The decision of the district court to permit the jury to view the indictment must therefore be upheld unless Smith's substantial rights were affected. *See United States v. Darwich*, 337 F.3d 645, 655-56 (6th Cir. 2003) ("[F]ailure to raise an objection in the district court . . . limits appellate review to a plain error inquiry . . . ."). Because there was significant evidence that connected Smith with the name "Pops Bishop," Smith cannot show that providing a copy of the indictment to the jury constituted plain error. *See Baker*, 418 F.2d at 853 (finding that the defendant's constitutional rights were not affected where "the overwhelming weight of the evidence of guilt presented [made] it . . . clear beyond a reasonable doubt that neither a refusal to permit the jurors unlimited access to the[] copies of the indictment nor the offering of a proper contemporaneous instruction would have altered the verdict").

## D.       Sentencing issues

### 1.       *Enhancement on the basis of Smith's prior conviction*

Smith further argues that the district court erred in sentencing him in accordance with the mandatory minimum sentence imposed by 21 U.S.C. §§ 841(b)(1)(A) and 851. Pursuant to these provisions, a person who possesses five kilograms or more of powder cocaine with the intent to distribute the cocaine must be sentenced to a statutory minimum of ten years in prison. The mandatory minimum sentence is doubled to twenty years, however, if the offender "commits such a violation after a prior conviction for a felony drug offense has become final." 21 U.S.C. § 841(b)(1)(A).

Smith had a prior conviction in Texas for possessing controlled substances with the intent to distribute. On this basis, the district court determined that it was required to impose the mandatory minimum sentence of 20 years. But Smith alleges that his prior conviction may not be

used to enhance his sentence because the government failed to prove that Smith had "either waived or was afforded prosecution by indictment for the offense for which such increased punishment may be imposed," 21 U.S.C. § 851(a)(2), as it must do in order for his sentence to be enhanced. He concedes, however, that his argument is foreclosed by this court's decision in *United States v. Gaitan-Acevedo*, 148 F.3d 577, 594 (6th Cir. 1998) ("interpret[ing] the 'indictment or waiver' phrase to refer to the federal offense for which the mandatory sentence is imposed," and not to the prior conviction).

Smith raises the argument simply to preserve his objection for possible en banc rehearing or Supreme Court review. Because we are bound by our prior precedent, Smith's contention on this issue has no merit. *See Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) ("A panel of this Court cannot overrule the [published] decision of another panel.").

### 2. *Enhancement for obstruction of justice*

Finally, Smith argues that the district court violated his Sixth Amendment rights in sentencing him on the basis of judge-found facts. The district court applied a two-level enhancement to Smith's sentence after finding that he had obstructed justice by absconding during his trial and remaining a fugitive for 12 years. These facts were neither submitted to a jury nor admitted by Smith. This is a violation of Smith's Sixth Amendment rights as declared in *United States v. Booker*, 125 S. Ct. 738, 749 (2005). *See also United States v. Oliver*, 397 F.3d 369, 380 (6th Cir. 2005) (holding that the Sixth Amendment is violated if a district court "impos[es] a more severe sentence than is supported by the jury verdict").

Under these circumstances, we would normally have to remand Smith's case for resentencing. *See United States v. Alva*, 405 F.3d 383, 385 (6th Cir. 2005) (remanding for resentencing where the district court "concluded that [the defendant] had obstructed justice, . . . a fact neither reflected in the jury verdict nor admitted by [the defendant]"). The present case is unusual, however, because the district court was required to sentence Smith in accordance with the mandatory 20-year minimum dictated by 21 U.S.C. §§ 841(b)(1)(A) and 851. Smith was sentenced to 240 months (20 years) of imprisonment, and, if his case were remanded, the district court would not have the discretion to impose a shorter term of imprisonment. *See United States v. Johnson*, No. 03-6477, 2005 WL 1059276, at *5 (6th Cir. May 5, 2005) (unpublished) ("*Booker* does not apply when the defendant has been sentenced to the mandatory minimum."). We therefore conclude that a remand of Smith's case for resentencing is unnecessary.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.