RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0311p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

Nos. 24-3545/3553

*v.*

CHRISTOS KARASARIDES, JR. (24-3545); RONALD A.
DIPIETRO (24-3553),

*Defendants-Appellants.*

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Akron.
No. 5:21-cr-00259-5—Donald C. Nugent, District Judge.

Argued:  July 31, 2025

Decided and Filed:  November 17, 2025

Before:  MOORE, GRIFFIN, and NALBANDIAN, Circuit Judges

─────────────────

## COUNSEL

**ARGUED:**  Jeffrey B. Lazarus, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio,
for Christos Karasarides, Jr.  Benton C. Martin, FEDERAL COMMUNITY DEFENDER'S
OFFICE, Detroit, Michigan, for Ronald A. DiPietro.  Joseph B. Syverson, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Jeffrey B.
Lazarus, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Christos
Karasarides, Jr.  Benton C. Martin, FEDERAL COMMUNITY DEFENDER'S OFFICE, Detroit,
Michigan, for Ronald A. DiPietro.  Joseph B. Syverson, Gregory S. Knapp, S. Robert Lyons,
UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

———————————

**OPINION**

———————————

NALBANDIAN, Circuit Judge.  Jason Kachner, Christos Karasarides Jr., Larry Dayton, and Ronald DiPietro created two illegal gambling businesses in northern Ohio:  Skilled Shamrock and Redemption.  Both housed gaming machines where players could try to win cash.  Everything about these operations relied on cash:  cash payouts to players, cash to employees, and cash profits to the owners.  With cash profits, the owners could hide their income day-to-day, and DiPietro, an accountant, helped them hide it on the back-end in the tax returns they filed with the IRS.

For all this, a jury found Christos Karasarides Jr. and Ronald DiPietro guilty of a series of conspiracies and stand-alone tax-related crimes.  Now they challenge the procedures of their trial and their sentencing.  Because none of their arguments has merit, we AFFIRM.

**I.**

**A.**

In 2009, four friends—Jason Kachner, Christos Karasarides Jr.[1], Larry Dayton, and Ronald DiPietro—established Redemption, a gambling room, in Canton, Ohio.  As a "skilled" gaming room, it housed games like 7–7–7 (pull the lever and hope the screen lines up three sevens).  Winners would take home cash.  Though cash gaming rooms were once legal, they were illegal by the time Redemption was in operation.  The owners knew that cash payouts were a problem, but they also recognized that the promise of cash enticed gamblers to visit.  So they persisted in their scheme.

In 2010, Jason Kachner started another skilled gaming room, Skilled Shamrock.  Skilled Shamrock was half the size of Redemption.

———————————

[1]Because Christos shares a last name with another person in this case—his son Christopher Karasarides—we refer to him throughout as Christos.

Christos and Kachner wanted Redemption and Skilled Shamrock to fly under the legal radar. Because they're both felons, they thought that if they owned the companies in name, that would pose a problem. So Dayton was the nominal owner of Redemption from 2009 to 2013, but when he began to have drug problems, they transferred the title from Dayton to Thomas Helmick. Helmick didn't run the business, but employees were told to name Helmick as the owner if anyone asked. Facing the same felon problem at Skilled Shamrock, Christos and Kachner listed Derek Phillips as the owner.

DiPietro initially participated in both businesses.

As for Redemption, DiPietro had a limited role. Redemption leased machines from DiPietro's side business—RNB Leasing—which he used to lease gaming machines to Skilled Shamrock and Redemption. But in 2011, Christos, Kachner, and Dayton bought DiPietro out. And they also cut ties with RNB Leasing and bought their own machines. Redemption managed its finances with little formality, and its owners destroyed any weekly financial records. Redemption was a cash business that mostly paid its owners in cash, and sometimes Kachner would deliver Christos his earnings.

As for Skilled Shamrock, DiPietro had a more central role. He ran Skilled Shamrock's finances like a well-oiled machine. He worked with fellow associates at his accounting firm to facilitate a weekly owners' meeting that discussed cashflow and profit. Each week, the accountants entered the same information into an audit spreadsheet from November 2009 to June 2017. It documented the profitability of each machine, and the business's total expenses and profit. For example, the weekly expenses included payments to RNB Leasing for the gaming machines it leased to Skilled Shamrock. The weekly expenses included employee wages—paid in cash. It didn't include employment taxes that should have been withheld from each paycheck and paid to the IRS.

The spreadsheet also had a formula for distributing profits to the owners, with "R"—Ron DiPietro—and "CK"—Christos Karasarides, front and center. Half went to Kachner, Christos, and Dayton, while the other half was split between Christos and DiPietro. Christos's portion (of his 50% share with DiPietro) was ultimately divided into thirds between Christos, Kachner, and

Dayton.  All expenses were withdrawn from DiPietro's share.  These profits were paid in cash.  And sometimes, Kachner would deliver that cash to Christos directly.

The success of both businesses depended on laundering cash, which DiPietro aided in.  For instance, beginning in 2013, DiPietro helped Kachner put his taxes together.  Kachner's taxes reflected his ownership of a legitimate used car business, but he never reported any ownership interest in Skilled Shamrock or Redemption.  To explain his other cash income, Kachner reported working as a "handyman."  Between 2013 and 2017, DiPietro's firm was responsible for Kachner's tax returns, and every year Kachner's taxes omitted any reference to Skilled Shamrock or Redemption.  All but Kachner's 2014 taxes were signed as "prepared by" DiPietro himself.

Christos had his own tax problems.  For tax years 2009 and 2010, the IRS civilly investigated Christos because he hadn't filed any tax returns.  He had earned legitimate gambling income as a professional gambler, but the IRS flagged him because he hadn't reported those earnings.  And because he hadn't filed any taxes, he hadn't reported his ownership interest in Skilled Shamrock or Redemption either.  For 2009 and 2010 alone, Christos owed over half a million dollars in taxes, for which he later signed a consent agreement with the IRS.

Learning from (almost) all these mistakes, Christos began self-assessing his taxes without paying the balance.  That was true for tax years 2012, 2013, and 2014.  As the unpaid balance collected interest, the debt rose to about $3.1 million.

During the IRS's civil investigation for the 2009 and 2010 tax years, DiPietro represented Christos as his "power of attorney."  The IRS relies on a power of attorney during tax investigations because they "can't just discuss someone's personal tax records with anyone."  R.254, Trial Transcript Vol. 3, PageID 3102–03 (Ross).  So the IRS has the investigated taxpayer designate at least one person to be their "tax representation" during the proceedings.  *Id.* at PageID 3103.  That person becomes the single point of contact for the IRS.  DiPietro served in this capacity until November 2015, when Christos found new representation.

Christos's tax problems persisted.  The IRS kept trying to collect assets to satisfy these growing tax debts.  Christos and a lawyer friend, David Thomas, cooked up a plan to shield

Christos's new house from IRS judgment liens.  Thomas drafted a land contract between Christos and the owner of the home.  The plan kept title from vesting in Christos until he fully paid for the house.  R.263, Trial Transcript Vol. 5, PageID 3714.  In 2016, the owner wanted out, so Thomas used an LLC called One Dunkeith to step into the owner's shoes.  One Dunkeith became the legal owner of the property, and Christos retained his equitable interest in the property.  Thomas fronted the $27,000 needed to pay the previous owner and made the transfer.  Christos immediately paid Thomas back—in cash.  This plan functioned exactly as hoped.  The IRS had trouble valuing Christos's ownership interest in the property.  And it gave Christos a chance to launder cash by using illegal profits to make payments.

Thomas also helped Christos evade his supervised release responsibilities under a 2014 custodial sentence for unrelated money-laundering and drug-related offenses.  His supervised release conditions required him to find a job unrelated to gambling.  Rather than do that, Christos paid Thomas to list Christos as an employee of a company called Enterprise Internet Solutions.  For this, Thomas received $25,000 in cash, memorialized with a promissory note.

Christos laundered his cash in other ways, too.  With his son Christopher, he set up "ALCAK Properties" to invest in real estate.  Christopher was the named owner of ALCAK, but Christos was heavily involved in negotiations and often acted on ALCAK's behalf.  ALCAK entered a contract to purchase a commercial property to start a cigar bar.  Christopher signed the contract, but Christos negotiated the deal.  Christos gave the seller $30,000 in cash and asked the seller to knock $30,000 off the list price.  This way, ALCAK could "buy" the property for $280,000 rather than $310,000.  When the seller accepted, Christos and Christopher paid the monthly payments in cash.

Christos also courted "investors" for the cigar bar.  For example, he convinced his friend Roger Steed to write a $70,000 check.  Steed thought he would be an investor, but Christos immediately returned his $70,000 in cash and memorialized the now net-zero transaction with a fake promissory note.

**B.**

The operations' luck ran out in 2018 when the IRS executed a series of search warrants against the two gambling rings.  Various law enforcement agencies executed 32 individual search warrants at many locations.  In a third superseding indictment on June 29, 2023, a grand jury charged Christos, DiPietro, Helmick, and Christopher with 26 counts of conspiracy and individual counts related to their conduct associated with Skilled Shamrock and Redemption.

The indictment charged Christos with 12 counts.  Seven counts charged him for his dealings—conspiracy—in operating Skilled Shamrock and Redemption:  two conspiracies to operate an illegal gambling business (Counts 1 and 4, 18 U.S.C. § 371), three conspiracies to defraud the United States (Counts 2, 5, and 22, 18 U.S.C. § 371), and two counts of operating an illegal gambling business (Counts 3 and 6, 18 U.S.C. § 1955).  Christos was also charged with individual counts:  evasion of payment (Count 7, 26 U.S.C. § 7201), conspiracy to commit money laundering (Count 9, 18 U.S.C. § 1956(h)), tampering with a witness (Count 10, 18 U.S.C. § 1512(b)(1)), falsification of records (Count 11, 18 U.S.C. § 1519), and one count of filing false tax returns (Count 12, 26 U.S.C. § 7206(1)).

The indictment charged DiPietro in the conspiracy counts (1, 2, and 3) for his involvement with Skilled Shamrock.  And it also charged him with individual counts:  one count of evading payment (Count 8, 26 U.S.C. § 7201) and six counts of aiding and assisting in the preparation of false and fraudulent income tax returns for tax years 2013 to 2017 (the Kachners), and 2016 (Christos) (Counts 13 through 18, 26 U.S.C. § 7206(2)).

Before trial,[2] DiPietro moved to dismiss Count 8, claiming the government had failed to allege any affirmative acts within the limitations period.  He also moved to sever his trial from Christos's, claiming irreparable prejudice.  The district court denied both motions.  On the motion to dismiss, the district court held that DiPietro's argument—that he wasn't Christos's power of attorney during the limitations period—was meritless.  Any misleading or concealing conduct in connection with tax evasion could support the affirmative act requirement, and the absence of the power-of-attorney relationship was irrelevant.  On the motion to sever, the court

---

[2]Only Christos and DiPietro went to trial.  The rest of the co-conspirators pleaded guilty.

found that the alleged crimes shared a factual basis because the two were indicted together, that the economy of a joint trial was appropriate, and that any prejudice could be managed through less intrusive measures.

The jury found Christos guilty of all counts. The jury found DiPietro guilty of all counts except Count 14—the preparation of Kachner's 2014 taxes.

## C.

The court sentenced the two defendants separately on the same day, starting with DiPietro. In the base offense calculation, the government argued that both men should be sentenced according to a total tax loss of at least $3.5 million. This was the primary issue at sentencing.

The court made an initial finding at DiPietro's sentencing that his total offense level was 34, his criminal history category was I, and the corresponding advisory Guidelines range was 151 to 188 months' imprisonment. DiPietro contested the loss amount as too speculative and claimed that a base offense level tied to a loss between $1.5 and $3.5 million was appropriate. The court overruled DiPietro's objection because the loss computation was "as accurate as it c[ould] be." R.406, DiPietro Sentencing, PageID 5812. But the court agreed to reduce his total offense level by four points (to 30) because the government had not sufficiently proven a two-point obstruction enhancement, and DiPietro's health warranted another two-point reduction. The court relied on the corresponding sentencing range of 97 to 121 months to impose 112 months' imprisonment with a $4.8 million restitution obligation.

Christos's sentencing took place right after DiPietro's. To start Christos's hearing, the court made an initial finding about the Guidelines range—total offense level 37, criminal history category IV, and an advisory range of 292 to 365 months. Christos's primary challenge before sentencing was to the $3.5 million tax loss calculation. He claimed he shouldn't be responsible for tax losses of his co-conspirators, and that the government relied on speculative numbers to estimate Redemption's losses. And though the issue was squarely presented, the district court didn't make any factual findings on the issue. The court found the criminal history category slightly over-representative and relied on criminal history category III and an advisory range of

262 to 327 months when imposing Christos's sentence:  262 months with a $5.4 million restitution obligation.

Defendants appealed.

## II.

DiPietro's first argument relates to the district court's denial of his motion to sever.

A motion for severance is preserved for appellate review only if the issue is both raised before trial and again at the close of the evidence. *United States v. Swift*, 809 F.2d 320, 323 (6th Cir. 1987). DiPietro concedes that he failed to renew the motion. It's not clear what this means for the standard of review. In some cases, we've viewed this as a complete waiver, and in others we've reviewed for plain error. *United States v. Sherrill*, 972 F.3d 752, 762 (6th Cir. 2020) (noting the two approaches and collecting cases on both sides). Considering the modern proliferation of plain-error review and our general preference to resolve claims on the merits, viewing the concession as a complete waiver seems inappropriate. *See Rosales-Mireles v. United States*, 585 U.S. 129, 137 (2018); *cf. United States v. Raymore*, 965 F.3d 475, 484 (6th Cir. 2020) (noting that a Rule 29 motion that is not raised both at the close of the government's case and at the close of evidence is not waived but reviewed under the "manifest miscarriage of justice" standard). We note the dispute, but because there was no error here, we leave its resolution for another day.

## A.

In the federal system, joint trials are preferred. *Zafiro v. United States*, 506 U.S. 534, 537–38 (1993). "This is because there is almost always common evidence" enabling the "economy of a single trial." *United States v. Phibbs*, 999 F.2d 1053, 1067 (6th Cir. 1993).

The decision to hold a joint trial is within the sound discretion of the district court. If the consolidation "appears to prejudice a defendant or the government, the court *may* order separate trials." FED. R. CRIM. P. 14 (emphasis added). But severance isn't the presumptive remedy. And the district court has the discretion to "provide any other relief that justice requires." *Id.* That's why "less drastic measures, such as limiting instructions, often will suffice to cure any

risk of prejudice." *Zafiro*, 506 U.S. at 539 (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

Prejudice is thus at the crux of whether the district court abused its discretion. "[O]nly if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence" will a district court grant a severance. *Id.* Different circumstances raise different risks of prejudice. For example, when evidence would be improper for a jury to hear against one defendant but is admissible against his codefendant, prejudice may be severe. *See id.* When there are many defendants in a "complex case" with "markedly different degrees of culpability," the possibility of prejudice is "heightened." *Id.* (citing *Kotteakos v. United States*, 328 U.S. 750, 774–75 (1946)). When "essential exculpatory evidence" that would be available to the defendant in a solo trial would be unavailable in a joint trial, a court might also find prejudice. *Id.* (citing *Tifford v. Wainwright*, 588 F.2d 954 (5th Cir. 1979) (per curiam)). Each case is fact-specific and defendant-specific.

**B.**

DiPietro makes three arguments for why the joint trial resulted in reversible prejudice. First, based on his own affidavit, he argues that Christos would have testified on his behalf if the trials had been severed. Second, because he and Christos were of markedly different culpabilities, he claims that he was subject to spillover prejudice from the jury's exposure to Christos's guilt. Third, he claims that certain pieces of evidence that were admissible against Christos would have been inadmissible against him in a solo trial.

**1.**

Start with Christos's alleged exculpatory testimony. A claim that a separate trial would "[a]fford the defendant exculpatory testimony" is not enough. *United States v. Causey*, 834 F.2d 1277, 1287 (6th Cir. 1987). Rather, DiPietro must establish: "(1) a bona fide need for the testimony, (2) the substance of the testimony, (3) its exculpatory nature and effect, and (4) that the codefendant will in fact testify if the cases are severed." *Id.*

DiPietro swore that Christos would testify to divesting any interest in gambling establishments before June 2014; that all the information Christos provided in advance of preparing his tax returns was correctly reported on those tax returns; that Christos's income and assets were supporting his gambling addiction; and that DiPietro had stopped representing Christos in November 2015.

This affidavit doesn't satisfy *Causey*'s high bar. Even if Christos had told DiPietro that he had divested himself of his interests in the gambling establishments, that testimony wasn't exculpatory. The same is true of testimony that Christos had allegedly provided accurate information for his tax returns. Willful blindness isn't a defense to liability. *See* R.268, Trial Transcript Vol. 7, PageID 4258–59 (instructing the jury that "[n]o one can avoid responsibility for a crime by deliberately ignoring the obvious"). Further, Christos's use of illicit gambling proceeds to fuel his gambling addiction says nothing about DiPietro's willful (or not) support of a criminal conspiracy to evade taxes. So that evidence isn't exculpatory. And the fact that DiPietro stopped representing Christos in November 2015 was admitted through several IRS witnesses. So that evidence wasn't necessary. DiPietro's first argument fails.

**2.**

Next, take DiPietro's and Christos's comparative culpabilities. "[A] defendant is not entitled to a severance simply because the evidence against a codefendant is far more damaging than the evidence against him." *Causey*, 834 F.2d at 1288. We acknowledge that by trying two codefendants together, "there is always a danger that the jury will convict on the basis of the cumulative evidence rather than on the basis of the evidence relating to each defendant." *United States v. Warner*, 690 F.2d 545, 553 (6th Cir. 1982). So as it relates to prejudice, the inquiry is more specific: DiPietro must point us to specific "substantial," "undue," or "compelling" prejudice to justify reversal on the theory that there was "spillover" prejudice from Christos's overwhelming guilt. *United States v. Fields*, 763 F.3d 443, 457 (6th Cir. 2014).

DiPietro can't make this showing. He says that Christos's counsel went for jury nullification during closing, which indicated Christos's guilt. But counsel's closing arguments aren't evidence. *United States v. Sittenfeld*, 128 F.4th 752, 782 n.16 (6th Cir. 2025). They don't

tell us much beyond how counsel "conceptualized the evidence" or how counsel summarized the evidence to the jury. *See id.* And they don't speak to weight or admissibility of evidence against *anyone*, even Christos. R.268, Trial Transcript Vol. 7, PageID 4197–98.

DiPietro contributed to the schemes to a different degree than did Christos. But as the accountant of Skilled Shamrock, DiPietro was in the thick of the operation's money collection. Much testimony tied him to Skilled Shamrock's internal operations, ownership, and profit distribution. For the Skilled Shamrock conspiracy to succeed, it was essential that the participants lie on their taxes. DiPietro's role in helping them lie—as evidenced by the guilty verdict on the aiding and assisting charges—constitutes a core component of the scheme's longevity. DiPietro hasn't shown that he suffered a specific substantial, undue, or compelling prejudice.

**3.**

DiPietro claims that three pieces of evidence would have been inadmissible in a solo trial. First, evidence of Christos's millions in outstanding tax debt; second, a video of Christos carrying cash into a bank; and third, any evidence related to the Redemption conspiracy.

But this evidence may have been admissible in a solo trial. *Phibbs*, 999 F.2d at 1067; *United States v. Pierce*, 62 F.3d 818, 830 (6th Cir. 1995) ("Severance would not have precluded the government from introducing [the challenged] evidence"). The case centered on the cash nature of Skilled Shamrock, which was relevant to the tax evasion scheme. And the video showing Christos delivering this money to the bank confirms that the conspirators relied on cash in the normal course of their operations. Although he was not a participant in the Redemption conspiracy, DiPietro was charged with aiding in the preparation of false tax returns that involved earned income from Redemption. So evidence about the Redemption scheme was relevant to DiPietro's knowledge that the returns were false.

DiPietro's reliance on *United States v. Breinig*, 70 F.3d 850 (6th Cir. 1995), is misplaced. In *Breinig*, the defendant ex-husband could show prejudice because his wife's defense relied on "impermissible and highly inflammatory evidence of his bad character." *Id.* at 853. The jury was effectively "told, by well-credentialed experts, that [he] was an adulterous, mentally abusive,

and manipulating spouse." *Id.* That was enough to meet the "heavy burden of showing that the prejudice he suffered was compelling and unfair." *Id.* Still, the panel noted that this was the "exceptional case," resting on its "unique facts" that made it one of the "very few instances" where reversal was required because of prejudice. *Id.* Here, nothing so inflammatory was admitted against DiPietro.

\*        \*        \*

As noted, severance is an extreme remedy. In ordinary cases, other efforts by the district court can limit the possible prejudice inherent to a joint trial. One way is the use of limiting instructions. The district court here repeatedly admonished the jury to consider each defendant's guilt individually. For example, the court told the jury: "[T]he defendants are only on trial for the particular crimes charged in the third superseding indictment. Your job is limited to deciding whether the government has proved that crime or those crimes against that defendant or those defendants beyond a reasonable doubt." R.268, Trial Transcript Vol. 7, PageID 4198; *see also* R.268, Trial Transcript Vol. 7, PageID 4181, 4184, 4193, 4217; R.270, Trial Transcript Vol. 8, PageID 4382. This was enough to cure any prejudice that might have arisen.

We've repeatedly affirmed denials of motions to sever when district courts issue limiting instructions, and this case is no different. *Phibbs*, 999 F.2d at 1067 (court "neutralized any adversity" by issuing a limiting instruction that "each defendant's case was to be considered separately"); *Pierce*, 62 F.3d at 831 (limiting instruction mitigated possible prejudice); *United States v. Gibbs*, 182 F.3d 408, 434 (6th Cir. 1999) (same). At bottom, the jury is "presumed capable of sorting out the evidence applicable to each defendant and rendering its verdict accordingly." *United States v. Elder*, 90 F.3d 1110, 1120 (6th Cir. 1996).

**III.**

DiPietro argues that because the government did not allege an affirmative act of tax evasion within the limitations period, the district court erroneously denied his motion to dismiss. *See* R.152, 3d Suprsed'g Indict., PageID 799–802 (Count 8). We review the district court's denial of a motion to dismiss on statute of limitations de novo. *United States v. Cunningham*, 679 F.3d 355, 373 (6th Cir. 2012).

The government charged DiPietro with felony tax evasion, which requires a "willful[] attempt[] in any manner to evade or defeat any tax imposed by this title or the payment thereof." 26 U.S.C. § 7201. Felony tax evasion requires an affirmative act, and that act must have occurred within the limitations period—six years. 26 U.S.C. § 6531(2). So the government had to show that DiPietro committed at least one affirmative act after June 23, 2016. *United States v. Butler*, 297 F.3d 505, 511 (6th Cir. 2002) (explaining the relation-back doctrine to calculate the limitations window); *see also* R.87, 2d Supersed'g Indict., PageID 446–49 (Count 8). The government alleged many affirmative acts from after June 23, 2016. For example, that in September 2016 and March 2017 DiPietro incorrectly listed social security numbers or names on Christos's wife's tax returns for 2015 and 2016; that around September 2016 DiPietro submitted misleading documents supporting Christos's 2014 tax returns; and that DiPietro caused Christos's 2016 tax return to be filed without reporting Christos's earned income from Skilled Shamrock. R.87, 2d Supersed'g Indict., PageID 448–49.

DiPietro claims that these alleged acts can't support guilt for *felony* tax evasion. And it's true that the willful failure to file a tax return (and pay that tax) is a distinct crime from tax evasion. The first is a misdemeanor (under 26 U.S.C. § 7203), but that misdemeanor escalates to a felony when a failure to pay includes an affirmative act of evasion (under 26 U.S.C. § 7201). *See United States v. Ouwenga*, 173 F. App'x 411, 416 (6th Cir. 2006). And, as the Supreme Court has explained, the "filing of a false tax return" that contains misinformation is a "sufficient affirmative commission" to bump a misdemeanor into a felony. *Sansone v. United States*, 380 U.S. 343, 351–52 (1965). Circuit courts of appeals regularly state that the filing of false tax documentation is the sort of affirmative act necessary to a § 7201 conviction. *United States v. Hoskins*, 654 F.3d 1086, 1091 (10th Cir. 2011) ("[The defendant] admitted at trial that she signed the false 2002 return. This alone was sufficient to establish an affirmative act under § 7201[.]"); *see also United States v. Yurek*, 925 F.3d 423, 433 (10th Cir. 2019); *United States v. Mal*, 942 F.2d 682, 684–85 (9th Cir. 1991); *United States v. Pollen*, 978 F.2d 78, 87 & n.17 (3d Cir. 1992). And that's what the government alleged. There was no error in denying the motion to dismiss.

DiPietro also emphasizes he wasn't Christos's power of attorney in the IRS civil investigation after November 2015. According to DiPietro, this meant he could no longer act on Christos's behalf, and so he couldn't commit affirmative acts.

It's true that Christos replaced DiPietro as his power of attorney by then. But DiPietro's interpretation of the affirmative act requirement is novel, and we reject it. The idea that a fiduciary or agent relationship is necessary to commit an affirmative act has no basis in the text, and he's offered no reason why we should impose one. The statute is written broadly: it refers to "any manner" of evasion. 26 U.S.C. § 7201. With such a broad definition, the felony can arise based on an "undefined and unlimited" set of acts. *United States v. Hook*, 781 F.2d 1166, 1169 (6th Cir. 1986). That's why an "affirmative act is anything done to mislead the government or conceal funds to avoid payment of an admitted and accurate deficiency." *United States v. McGill*, 964 F.2d 222, 230 (3d Cir. 1992). Given that the statute is concerned with whether an act makes it harder for the government to track a taxpayer's assets, this novel interpretation has no basis in the text. Any means *any*, so no agent relationship is required. *Cf. United States v. Crum*, 529 F.2d 1380, 1382 (9th Cir. 1976) ("We reject Crum's contention that Section 7206(2) applies only to preparers of tax returns.").

## IV.

DiPietro next argues that the district court instructed the jury incorrectly. He says the court read the overt acts for Count One—the Skilled Shamrock conspiracy—as if they were fact. DiPietro says the court should have clarified that it was "not telling the jury that these statements of fact were allegations." DiPietro App. Br. at 43.

Normally, we review the district court's decision to read the indictment to the jury for an abuse of discretion. *United States v. Smith*, 419 F.3d 521, 530 (6th Cir. 2005). But without a contemporaneous objection, we review for plain error. In his proposed jury instructions, DiPietro preemptively objected both to reading the indictment and to giving the indictment to the jury. R.238, DiPietro's Proposed Instructions, PageID 2239 n.4, 2242 n.5, 2245 n.6. It is debatable whether this objection was sufficient to preserve the issue he raises on appeal. *See* R.268, Trial Transcript Vol. 8, PageID 4390–91 ("[A]ny objections, deletions, additions, or

modifications to the instructions?"). We need not decide which standard of review applies here, however, because the district court did not err.

When a district court reads an indictment to the jury, it helps inform the jury of the charges against the defendant. *United States v. Maselli*, 534 F.2d 1197, 1202 (6th Cir. 1976); *United States v. Stapleton*, 297 F. App'x 413, 427 (6th Cir. 2008). That's why the general rule is that a district court is "well within its discretion in deciding to read an indictment to the jury." *Smith*, 419 F.3d at 530. But if it does, the district court needs to issue a corresponding limiting instruction to indicate that the indictment is not evidence of guilt. *Stapleton*, 297 F. App'x at 427 (citing *United States v. Scales*, 594 F.2d 558, 561–62 (6th Cir. 1979)).

The district judge instructed the jury as to Count One by reading the overt acts listed in the indictment directly to the jury. And when the district judge started reading Count One, he didn't expressly clarify that he was reading from the indictment or that the indictment wasn't evidence. He said: "I wasn't going to do it but I think I will. I'll read you the overt acts at this point on. Count 1—could be any one of these." R.268, Trial Transcript Vol. 7, PageID 4210.

DiPietro says a cautionary instruction was necessary. He's wrong. By this point, the jury had been instructed that "[t]he indictment is not any evidence at all of guilt," nor does it "even raise[] any suspicion of guilt." *See* R.268, Trial Transcript Vol. 7, PageID 4182–83; *see also id.* at 4185 ("Now, the indictment isn't evidence."). And that the indictment is "simply the formal way the government tells any defendant the crime or crimes they are accused of committing." *See* R.268, Trial Transcript Vol. 7, PageID 4182–83. We've previously approved an almost identical instruction. *Stapleton*, 297 F. App'x at 427 (approving instruction that "[t]he indictment is not any evidence at all of guilt[]. It is just the formal way that the government tells the defendants what crimes they are accused of commit[ing] [sic]. It does not even raise any [suspicion] of guilt[]" (alterations in original)). No error occurred.

DiPietro analogizes to *Sandals v. United States*, 213 F. 569, 574 (6th Cir. 1914), and *United States v. El-Bey*, 873 F.3d 1015, 1021–22 (7th Cir. 2017), suggesting that, like in those cases, the district court basically told the jurors they must find him guilty. In *Sandals*, when the judge instructed the jury, he said: "the business in which they (defendants) were engaged did

operate as a fraud upon those who bought oil stock.  There can be no gainsaying that."  213 F. at 574.  He continued:  "There is no use for the jury to spend very much time upon that proposition[.]"  *Id.*  He said this even though the defense's theory was good faith.  *Id.*  And in *El-Bey*, when the judge explained the counts to the jury, he said "[s]o they *are* mail fraud because through use of the mail, you know, he got all this money, but they are also—they *are* also false claims."  873 F.3d at 1022.  So in both cases, the court made statements beyond those contained in the indictments themselves that prejudged a defendant's guilt and undermined the jury's ability to exercise its independent judgment.  These cases do not fit DiPietro's circumstances.  The district court read from the indictment and repeatedly told the jury the indictment was not evidence.  No error occurred.

## V.

The basis of the court's sentencing decisions for both Christos and DiPietro was its finding that they were responsible for at least $3.5 million in tax loss.  Christos and DiPietro raise substantive and procedural challenges to this finding.  Christos substantively challenges the $3.5 million number and raises a Rule 32 problem, suggesting that the court didn't make sufficient factual findings.  DiPietro raises a procedural argument—he claims the court didn't respond to his non-frivolous arguments regarding the loss calculations.

### A.

Below, Christos raised several arguments for why he thought a loss amount between $1.5 million and $3.5 million was more appropriate, contending that an accurate figure would have resulted in a two-point reduction to his base offense calculation.  U.S.S.G. §§ 2T1.1, 2T4.1.  On appeal, he argues again that $1.5 million was a more appropriate loss amount.

### 1.

The government bears the burden of proving the total tax loss by a preponderance of the evidence at sentencing.  *United States v. Riccardi*, 989 F.3d 476, 481 (6th Cir. 2021).  "We review the district court's method for calculating the tax loss de novo," and the tax loss amount for clear error.  *United States v. Chappelle*, 78 F.4th 854, 858–59 (6th Cir. 2023).  As to the fact-

finding, unless we are left with the "definite and firm conviction" that a mistake was made, we won't reverse. *United States v. White*, 492 F.3d 380, 414 (6th Cir. 2007) (quoting *United States v. Ware*, 282 F.3d 902, 907 (6th Cir. 2022)). This means that the district court's decision must not have been "outside the realm of permissible computations." *United States v. Smith*, 516 F. App'x 592, 597 (6th Cir. 2013) (quoting *United States v. Jackson*, 25 F.3d 327, 330 (6th Cir. 1994)).

The Guidelines recognize that the final loss number doesn't have to be precise. U.S.S.G. § 2T1.1 n.1. The court only needs to make a "reasonable estimate." *Id.*; *United States v. Igboba*, 964 F.3d 501, 508 (6th Cir. 2020). And all conduct that violates the tax laws "should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated." U.S.S.G. § 2T1.1 n.2. If the violations involve a failure to report a particular source of income (like income from business activity), that too can be considered. *Id.* In short, the tax loss is based on "*all relevant criminal conduct underlying the charged offense.*" *United States v. Daniel*, 956 F.2d 540, 544 (6th Cir. 1992).

**2.**

The government argued that Christos was responsible for $5,451,520 in total tax loss between 2012 and 2018. This calculation added together four sources.

*First*, $849,012 from unpaid taxes based on income earned from Skilled Shamrock and Redemption. Shamrock's weekly audit sheets and Kachner's testimony made calculating the estimated profit and Christos's proportional income from Skilled Shamrock straightforward. But Redemption didn't have the same recordkeeping, and the defendants destroyed records documenting profits. To calculate a number, the government imported the same income and profits from Skilled Shamrock to Redemption. Redemption had twice as many machines, so the government explained that Redemption likely would have been more profitable than Skilled Shamrock. Combined with Kachner's testimony about how profits were split, the government attributed the income and corresponding unpaid taxes to estimate Christos's unpaid taxes as $849,012 for both Skilled Shamrock and Redemption.

*Second*, $1,233,704 in co-conspirator tax losses from Kachner and Dayton.  Because Kachner and Dayton participated in the organization and operation of the two gambling ventures with Christos, the government argued that the co-conspirator losses were reasonably foreseeable to Christos, so he could be responsible for them at sentencing.

*Third*, $3,112,527 from Christos's own tax evasion.  For tax years 2012, 2013, and 2014, he self-assessed the taxes, but never actually paid the bill.  As interest accrued, that debt grew to $3.1 million.  This number didn't include his unpaid taxes from 2009 and 2010.

*Fourth*, $256,277 from Skilled Shamrock's unpaid employment taxes.  Skilled Shamrock was open 24/7 and it paid its employees in cash.  The IRS used employment records to estimate the payroll that would have been owed, then calculated the employment taxes that should have been deducted.  It found that from 2012 through 2018, the resulting loss to employee payroll taxes would have been about $256,277.  R.330, Gov. Sentencing Memo (Karasarides), PageID 5025.

Altogether, this amounted to a total loss of $5,451,520.  This is the amount that the district court used.

**3.**

Christos raises three issues with the tax loss calculation.  First, he claims he should not be responsible for Kachner's and Dayton's individual tax losses.  Second, he argues that the estimated losses at Redemption were too speculative to be reliable.  Third, he contests the $3.1 million tax evasion loss as based on double-counting.

As for the co-conspirator losses, Christos argues that the government abandoned its position at sentencing that he should be responsible for these losses.  He points to this line by the government:

> *[Christos] is not responsible for the tax loss from his co-conspirators.*  I don't think the tax loss computation could be done any better than it has been.  The computation from Redemption was conservative.  The testimony was Redemption had more profits. We used the same with Skilled Shamrock.  I think the tax loss computation couldn't be better, and we have professionals who do that, and we stand by it.

R.408, Karasarides Sentencing, PageID 5831 (emphasis added). But a few minutes later, the government reiterated its argument that Christos should be sentenced according to the co-conspirator losses. The government said: "[T]he tax loss for Mr. Karasarides alone regardless of including [any] co-conspirator[ losses]" was above $3.5 million. R.408, Karasarides Sentencing, PageID 5834. The government didn't abandon its position—it misspoke. The district court properly assigned the co-conspirator losses to Christos. *United States v. Lombardo*, 582 F. App'x 601, 619–20 (6th Cir. 2014).

Christos next challenges the Redemption profit estimate as too speculative to be reliable. Though obviously related, the relevant question isn't whether the estimate is speculative, it's whether the government proved the amount by a preponderance of the evidence. *See* U.S.S.G. § 2T1.1 n.1; *United States v. Igboba*, 964 F.3d 501, 508 (6th Cir. 2020). Because the defendants destroyed the records that would have made the Redemption tax loss finding more precise, this argument lacks merit. Attributing the same income generated by Skilled Shamrock to Redemption was a conservative and reasonable extrapolation based on the size of the two operations.

His last challenge is to the tax evasion loss. Christos says the income tax loss from Skilled Shamrock and Redemption ($849,012) was double-counted in the tax-evasion loss ($3.1 million). The IRS summary witness testified that the $849,012 resulted from Christos's unreported income both from his own legal gambling and his income from the gambling parlors. By contrast, the $3.1 million arose based on the taxes Christos self-assessed, never paid, and that continued to grow with interest. Two different sources.

Section 2T1.1 calls for determining the tax loss based on the "*amount of the tax that the taxpayer owed* and did not pay." *United States v. May*, 568 F.3d 597, 605 (6th Cir. 2009) (quoting § 2T1.1(c)(3)). That means that if two sources of tax loss were owed, they can be aggregated. *See id.* So the question is whether the two taxes are attributable to different losses to the government. Since they are here, the district court didn't err when it held Christos responsible for both.

\*          \*          \*

**B.**

Christos raises a related but separate challenge to the district court's factual finding on the tax loss at sentencing. He claims the district court failed to sufficiently articulate its findings on the disputed-loss issue consistent with Federal Rule of Criminal Procedure 32. *See* FED. R. CRIM. P. 32(i)(3)(B).

In general, we review a district court's compliance with Rule 32 de novo. *White*, 492 F.3d at 414. But Christos never objected to the district court's factual findings at sentencing, and when the court asked the *Bostic* question, he said he had no new objections. Having failed to do so, Christos bears the burden of showing that an error occurred that was plain, affected his substantial rights, and undermined the integrity and fairness of his sentencing. *United States v. Chanh Chan Lao*, 287 F. App'x 472, 474 (6th Cir. 2008) (applying plain error to an unpreserved Rule 32(i)(3)(B) challenge).

Rule 32(i)(3)(B) mandates that for "any disputed portion of the presentence report," the district court must "rule on the dispute." Once the defendant "actively raise[s]" a fact dispute, the court's fact-finding obligation arises. *White*, 492 F.3d at 415. It isn't enough for the court to "summarily adopt the factual findings in the presentence report or simply declare that the facts are supported by a preponderance of the evidence." *Id.* (quoting *United States v. Solorio*, 337 F.3d 580, 598 (6th Cir. 2003)). Courts must "affirmatively rule" on the dispute, so long as it "*could potentially* impact" the defendant's sentence. *Id.* (emphasis added). Though harmless error applies to Rule 32 violations, we require "literal compliance" with this provision. *Id.* (collecting cases); *United States v. Corrado*, 227 F.3d 528, 540 (6th Cir. 2000). Doing so ensures that defendants are "sentenced on the basis of accurate information." *United States v. Fry*, 831 F.2d 664, 667 (6th Cir. 1987) (quoting *United States v. Eschweiler*, 782 F.2d 1385, 1387–88 (7th Cir. 1986)). It also improves the clarity of the record on appeal. In sum: the district court must "*actually find facts*, and it must do so by a preponderance of the evidence." *White*, 492 F.3d at 416.

At Christos's sentencing hearing, the district court made an initial finding to adopt the PSR and its recommended offense level (37), which was based on the $3.5 million loss, and

never revisited this decision.  This was an error by the district court.  Rule 32's mandate is clear, and Christos contested the tax loss issue at every phase of sentencing.  "[L]iteral compliance" with Rule 32 is part and parcel to its protections.  *See White*, 492 F.3d at 415.**[3]**

Regardless, even if the error were plain, Christos hasn't explained how his substantial rights were affected.  To succeed on the substantial rights prong, the defendant carries the burden to show that he was prejudiced.  And prejudice—as it relates to the adequacy of the court's explanation—arises from "the inference that the district court would have reached a different sentence if it had reasoned properly."  *United States v. Nesbitt*, 770 F. App'x 728, 732 (6th Cir. 2019) (quoting *United States v. Gabbard*, 586 F.3d 1046, 1051 (6th Cir. 2009)); *see also United States v. Bradley*, 897 F.3d 779, 784–85 (6th Cir. 2018) (discussing the procedural error that occurs when a court fails to "explain the selected sentence" as required by *Gall v. United States*, 552 U.S. 38 (2007), and the district court's burden to make factual findings under Rule 32).

Given our discussion about the evidence supporting the $3.5 million loss number, Christos's substantial rights were not affected.  And we have previously affirmed a Rule 32 error when the defendant's substantial rights were not affected because the record "amply support[ed]" a "conservative estimate" described in the PSR's facts.  *Bradley*, 897 F.3d at 784–85.  We do so again here.

## C.

DiPietro's only challenge to the tax loss is that the court didn't respond to his non-frivolous arguments.  DiPietro objected to the total loss calculation in raised specific objections to the PSR.  These objections noted five issues with the PSR's proposed $3.5 million loss:  (1) he was acquitted of Kachner's 2014 tax loss, (2) he didn't do Kachner's 2017 taxes, (3) he didn't do Christos's 2017 or 2018 taxes, (4) the tax loss should be reduced by the amount Christos and his

---

**[3]**The government suggests that even though the court didn't revisit the fact-finding, the court "implicitly" adopted the PSR and the government's evidence based on the sentence the court ultimately imposed. **Appellee Br. at 39–41.**  But we've expressly rejected this logic before.  *United States v. Griffin*, 656 F. App'x 138, 142 (6th Cir. 2016).  When the trial judge fails to make "independent findings," even if he listens to the arguments raised by the parties and adopts "without elaboration" the recommendation from the PSR, he fails his Rule 32 obligation.  *United States v. Middleton*, 246 F.3d 825, 847 (6th Cir. 2001).

wife reported on their taxes, and (5) Christos's tax loss and evasion computations were redundant.

But in his sentencing memo, DiPietro didn't offer any substantive argument in favor of any of these five objections. And at sentencing, DiPietro didn't raise any of these objections. He also didn't offer any explanation or legal support for how those PSR objections would impact the tax loss calculation. Instead, he challenged the $3.5 million loss because it was "speculative in nature," and because he believed it "should be reduced" by two levels. R.406, DiPietro Sentencing, PageID 5783. According to counsel, it's "just clear that it is not an exact figure, and it could be way off," because the number was an "extrapolation, an estimation," so a $1.5 million loss would be "more equitable." R.406, DiPietro Sentencing, PageID 5784, 5794, 5795.

When the court imposed the sentence, it said:

> The loss computation is as accurate as it can be. They have the accountants and other professionals and the IRS working on that, and I think their loss computation is as good as any, and there is nothing to dispute that really, and I think the loss computation is correct.

R.406, DiPietro Sentencing, PageID 5812. DiPietro didn't object to this explanation. And he didn't ask the court to respond more specifically to the objections he had once raised in the PSR. When asked the *Bostic* question, DiPietro merely "preserve[d] and renew[ed] all [his] prior objections to the presentence report." R.406, DiPietro Sentencing, PageID 5815. Without a contemporaneous objection, we review the sufficiency of the court's explanation for plain error only.

When defendants raise a "particular, nonfrivolous argument" in favor of a lower sentence, the "record must reflect both that the district judge considered the defendant's argument and that the judge explained the basis for rejecting it." *United States v. Wallace*, 597 F.3d 794, 803 (6th Cir. 2010) (citation modified). The problem for DiPietro is that several of his arguments were frivolous, so they didn't warrant explanation. *Cf. McCoy v. Ct. of Appeals of Wis., Dist. 1*, 486 U.S. 429, 436 (1988) (describing "frivolous arguments" as those that "cannot conceivably persuade the court"). For example, DiPietro contested liability for Christos's 2017 and 2018 tax returns, but that conduct related to the conspiracy in Count 2—which the jury

found him guilty of. The same goes for Kachner's 2017 taxes. The jury found DiPietro guilty of falsifying that return (Count 17). DiPietro sought to relitigate his convictions, and that wasn't worth the court's time. *See United States v. Simmons*, 587 F.3d 348, 361 (6th Cir. 2009); *United States v. Gale*, 468 F.3d 929, 940 (6th Cir. 2006) ("[A]rguments clearly without merit can, and for the sake of judicial economy should, be passed over in silence." (quoting *United States v. Cunningham*, 429 F.3d 673, 678 (7th Cir. 2005))).

Regardless, DiPietro never developed substantive arguments on any of the objections he raised in the PSR, either in his sentencing memo or at the hearing. A district court has no obligation to "address vague suggestions in favor of a lower sentence." *United States v. Judge*, 649 F.3d 453, 460 (6th Cir. 2011) (citation modified); *United States v. Satterfield*, No. 23-3068, 2024 WL 3443335, at *2 (6th Cir. July 17, 2024) (finding that counsel's statement, "I would just say that maybe somewhere in the 13-to-12-month range would be more appropriate for this situation," was too vague to warrant a response by the district court). No error occurred.

DiPietro tries to analogize to *United States v. Wallace*, 597 F.3d 794 (6th Cir. 2010), in which the court said it wasn't apparent from the record "why the district judge decided to impose a sentence more than twice as long as" a codefendant's sentence. 597 F.3d at 803. That was the exact issue the defendant raised at sentencing. *Id.* at 802. So though the government offered its own explanations for why court's sentencing disparity was justified, the government couldn't point to any part of the transcript that "show[ed] that the district court ever considered these issues." *Id.* That's enough to distinguish *Wallace* from this case: the defendant in *Wallace* developed the arguments at sentencing and the court failed to respond to them. Without any evidence that DiPietro contested these issues at sentencing, the district court had no corresponding responsibility to respond to them.

DiPietro made one argument at sentencing: that the loss amount was speculative. So that's the argument the district court responded to, albeit in an abbreviated fashion. R.406, DiPietro Sentencing, PageID 5784, 5794–95. The breadth and extent of the court's explanation matched the superficiality with which DiPietro contested the loss amount. *See Rita v. United States*, 551 U.S. 338, 356 (2007); *see also United States v. Whitely*, 356 F. App'x 839, 846 (6th Cir. 2009) ("After voicing no objections, offering no arguments, and not even submitting his

view of an appropriate sentence, he received a presumptively reasonable within-Guidelines sentence premised upon a correctly-calculated range. . . . Accordingly, we cannot say that the alleged error seriously affected the fairness of the proceedings." (citation omitted)).

**VI.**

Christos also challenges the court's application of a sophisticated-means enhancement at sentencing. He claims that his scheme wasn't sophisticated enough to warrant this two-point enhancement, and that the court didn't make the necessary factual findings under Rule of Criminal Procedure 32.

**A.**

Our cases inconsistently describe the standard of review for challenges to the sophistication enhancement. We always review the trial court's findings of historical facts for clear error, and we review pure legal questions de novo. But we've been inconsistent on how to review the application of the facts to the "sophisticated means" definition. Sometimes, we've reviewed this application question de novo, and other times we've reviewed it for clear error. *See United States v. Rupp*, No. 22-1240, 2023 WL 370908, at *5 (6th Cir. Jan. 24, 2023) (noting the inconsistent treatment). *Compare United States v. Daulton*, 266 F. App'x 381, 388 (6th Cir. 2008), *with United States v. Thomas*, 841 F. App'x 934, 938 (6th Cir. 2021). Regardless, even if we reviewed de novo the application here, the court correctly applied the enhancement.

A participant in a tax scheme is subject to a two-point enhancement if the defendant's tax evasion involved "sophisticated means." U.S.S.G. § 2T1.1(b)(2). "Sophistication" means "especially complex" or "especially intricate" conduct that relates to the "execution or concealment of an offense." *Id.* § 2T1.1 n.5. This includes conduct such as "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." *Id.* But this list is not exhaustive. The key to the enhancement is whether the defendants went through such efforts to "conceal the offense" that would "decrease the likelihood of detection." *Id.* (background).

We've found that a scheme was sophisticated when the defendant "paid his employees with cash, personal checks, and checks from a business" other than his primary business and relied on checks under $10,000 to avoid banking disclosure laws. *United States v. Paul*, 57 F. App'x 597, 610–11 (6th Cir. 2003). And failing to record transactions or otherwise keep receipts can contribute to sophistication. *United States v. Middleton*, 246 F.3d 825, 848 (6th Cir. 2001). So a scheme is sophisticated if its structure makes it harder for the scheme to be uncovered.

The trial evidence established that Christos's illegal gambling business and tax evasion scheme were sophisticated. Christos set up ALCAK Properties to pay off fake investments. He took an investor's check for an alleged property investment through ALCAK, paid the investor back in cash, and retroactively memorialized the transaction with a fake promissory note. He used ALCAK to buy a property, then he worked with the seller to adjust the paperwork's sale price to hide a $30,000 off-the-books payment he made. Christos had his lawyer help him set up a fake job with a company and had his lawyer write a check to that company for $25,000, which Christos paid his lawyer back for—in cash, to launder the money. And he and his lawyer structured a land contract to keep Christos's house out of the IRS's reach.

Christos insists that his *tax evasion* was not sophisticated, even if his illegal gambling business was. On his view, imposing the sophistication enhancement for an unsophisticated form of tax evasion is impermissible. But Christos evaded taxes to launder the cash from his highly sophisticated gambling business. The tax evasion was intertwined with the broader scheme. So we see no error in the district court's judgment.

**B.**

Christos also claims the district court violated Rule 32 because it didn't make an adequate factual finding to impose the sophistication enhancement. We typically review this issue de novo, *White*, 492 F.3d at 414, but Christos didn't make any objection at sentencing. R.408, Karasarides Sentencing, PageID 5860 (responding to the *Bostic* question with "No, your Honor"); *United States v. Roberts*, 919 F.3d 980, 987 (6th Cir. 2019) (reviewing sentencing enhancements for plain error where defendant failed to object). So Christos carries the burden to show that a plain error affected his substantial rights, and affected the fairness, integrity, or

public reputation of the judicial proceedings. *United States v. Holt*, 116 F.4th 599, 613 (6th Cir. 2024).

As discussed, Rule 32(i)(3)(B) mandates that the district court "rule on the dispute" for "any disputed portion of the presentence report." Inherent to the rule is the obligation that the defendant "actively raise the dispute" at sentencing. *White*, 492 F.3d at 415. If the defendant fails to put the fact at issue with "specificity and clarity," then the court has no duty to make factual findings. *Holt*, 116 F.4th at 614 (quoting *Quintero v. United States*, No. 91-1304, 1991 WL 224078, at *3 (6th Cir. Oct. 31, 1991) (per curiam)); *White*, 492 F.3d at 415. That's why a "bare denial" of a fact is not enough to trigger a court's Rule 32 fact-finding obligation. *Holt*, 116 F.4th at 614 (quoting *United States v. Small*, 988 F.3d 241, 257 (6th Cir. 2021)).

At sentencing, the extent of Christos's discussion of the issue was to say: "I don't see it as a situation where it is a substantially sophisticated scheme." R.408, Karasarides Sentencing, PageID 5833. This bare denial was insufficient to trigger the Rule 32 obligation. *See Holt*, 116 F.4th at 614. Counsel's statement looks almost identical to other statements we've rejected as being too vague to trigger Rule 32's fact-finding obligation. *United States v. Lang*, 333 F.3d 678, 680–81 (6th Cir. 2003). The court did not err by failing to make a finding of fact on the sophistication issue.

## VII.

Christos claims that the district court invoked the wrong legal standard after he asked for a variance, indicating that the court "improperly found that it could not vary from the guidelines range based on policy disagreements alone." Karasarides App. Br. at 21–26. In essence, he says the district court didn't understand its discretion to vary. He points to the court's statement at sentencing that:

> [W]hen it involves a lot of money, the Guideline numbers go way up, right? And to a lot of people [it] seems unfair and maybe punitive because compared to . . . different cases where you say 'but if I was selling cocaine on the street corner, or if I rob somebody at a bank, I would have less time that I would be facing than what you are facing now' because of the amount of loss . . . we get to this point in every sentencing situation like this that exists. But I say that, and then on the other hand, I say, well, the Guidelines took all that into consideration,

and there is a reason that Congress has adopted the Guidelines to take these enormous numbers into consideration and say that the trial judge has to take that into consideration. And then in order to vary from the Guidelines there has to be a substantial reason that wasn't considered by the Sentencing Commission when they established it.

R.408, Karasarides Sentencing, PageID 5836. The court continued, noting that it "d[id]n't think it [wa]s appropriate to do a variance just because the Guidelines are so high." *Id.* at 5837.

We review whether the district court "misunderstood its discretion to deviate from the Guidelines" for an abuse of discretion. *United States v. Hensley*, 110 F.4th 900, 907 (6th Cir. 2024). A court commits a procedural error when it doesn't recognize its discretion to impose a sentence outside the Guidelines range. But in general, "we presume that the district court understood its discretion" to vary "absent clear evidence to the contrary." *United States v. Douglas*, 563 F. App'x 371, 378–79 (6th Cir. 2014) (quoting *United States v. Santillana*, 540 F.3d 428, 431 (6th Cir. 2008)). So as it relates to variances, what matters is that the court understands that it can "deviate as it sees fit based on the 18 U.S.C. § 3553(a) factors." *Hensley*, 110 F.4th at 907. The court has no simultaneous obligation to *reject* the Guidelines. *Id.*; *United States v. Brooks*, 628 F.3d 791, 800 (6th Cir. 2011).

The court's statement here is best read as providing a reason *not* to vary. *United States v. Ruiz*, 777 F.3d 315, 322 (6th Cir. 2015) ("[A] straightforward reading of Ruiz's sentencing hearing indicates that the district court *did* recognize its authority to depart and/or vary and that it simply declined to do so."). It's true the court acknowledged that the Guidelines ratchet up quickly when the dollar value of the tax loss increases. But it didn't also say it was *bound* by that recommendation. Instead, the court asked the government to discuss the scale and scope of the investigation, the length of the fraud, and the resources it took to uncover the illicit activity. And this latter discussion suggests that the court didn't think the high range warranted a variance because Christos never alerted the authorities to the scheme. As the court explained,

It [wa]s a gigantic enterprise, endeavor by law enforcement to get where we are. And it probably could have been avoided if there had been a little bit of honesty from you and Mr. DiPietro and may have nipped this, not in the bud, but may have been able to minimize your exposure to what would happen.

R.408, Karasarides Sentencing, PageID 5856.  The court didn't have an obligation to note that it understood it could vary but was opting not to.  *Ruiz*, 777 F.3d at 321 ("We do not require that a district court explicitly state that it is aware of its discretion . . . .").  That Christos asked for and received a departure based on the criminal history score further confirms the court understood it had discretion to impose a sentence outside the Guidelines range, but chose not to.

Christos attempts to invoke *United States v. Thomas-Mathews*, 81 F.4th 530 (6th Cir. 2023), to support his view that the court didn't recognize its discretion.  There, the court faulted the district court's reliance on the "legally erroneous belief that Congress or the U.S. Sentencing Commission—and not the district court—have ultimate discretion to determine the appropriate crack-to-powder ratio" before it could sentence a particular defendant.  *Id.* at 541.  Here, the district court's passing reference to Congress is better viewed as a reference to—as Christos's counsel put it—the "gravitational pull" that the Guidelines have in anchoring the court's sentencing decision.  R.408, Karasarides Sentencing, PageID 5837.  No error occurred.

## VIII.

DiPietro raises a final argument, this time to contest the district court's decision to issue an amended judgment.  As an initial matter, we note that DiPietro appealed only the original judgment, not the amended judgment.  Moreover, DiPietro's Notice of Appeal, filed on June 21, 2024, divested the district court of jurisdiction to enter the amended judgment on June 24, 2024.  *See United States v. Holloway*, 740 F.2d 1373, 1381–82 (6th Cir. 1984).  The error in the original judgment, however, is best characterized as merely a scrivener's error under Rule 36.  So we remand for the district court to properly correct that error.  *See, e.g.*, *United States v. Burgess*, 209 F. App'x 497, 502 (6th Cir. 2006) (affirming conviction but remanding for correcting of a clerical error); *United States v. Beasley*, 199 F. App'x 418, 425 (6th Cir. 2006) (same).

In general, a defendant "shall pay interest on any fine or restitution of more than $2,500." 18 U.S.C. § 3612(f)(1).  And before the court can "waive" restitution interest, it must "determine[] that the defendant does not have the ability to pay interest."  *Id.* § 3612(f)(3).  Structured this way, the statute creates a presumption in favor of interest.  *United States v.*

*Bagdy*, 353 F. App'x 695, 697 (3d Cir. 2009) ("There is a presumption that a defendant 'shall pay interest on any fine or restitution of more than $2,500.'" (quoting 18 U.S.C. § 3612(f)(1))).

Before sentencing and at sentencing, DiPietro presented no arguments about why the court should waive restitution interest.  So neither the parties nor the court discussed restitution at the sentencing hearing.  After sentencing, the district court issued its final judgment.  But that judgment was internally inconsistent.  The box next to "[t]he defendant must pay interest on restitution" and the box next to "the interest requirement is waived" were both selected.  R.362, Judgment, PageID 5578.

Less than two weeks later, the district court sua sponte issued an amended judgment with the second checkmark removed.  The amended judgment indicated that the defendant "must pay interest on restitution."  R.380, Amended Judgment, PageID 5641.

DiPietro acknowledges the statutory presumption in favor of restitution interest but insists that issuing this amended judgment was a procedural error because the court substantively altered his sentence by imposing a new condition:  interest.  We review the district court's power to amend the judgment de novo.  *United States v. Robinson*, 368 F.3d 653, 655–56 (6th Cir. 2004).

Rule 36 allows a district court to "correct a clerical error in a judgment, order, or other part of the record" after it "giv[es] any notice it considers appropriate."  FED. R. CRIM. P. 36(a).  At any time, a district court can amend the judgment to correct any typographical or clerical errors.  *United States v. Carr*, 421 F.3d 425, 432–33 (6th Cir. 2005).  But the court can't use this power to add substantive requirements to the sentence, or to add unexpressed intentions to the defendant's terms of his sentence.  *Id*.

Though "clerical" isn't defined by the rule, a trial can correct errors that are "merely of recitation, of the sort that a clerk might commit."  *Id.* at 433 (citation modified) (quoting *United States v. Coleman*, 229 F.3d 1154, 2000 WL 1182460, at *2 (6th Cir. Aug. 15, 2000)); *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (Rule 36 applies to "clerical errors, oversights, and omissions").  Examples from ours and other circuits highlight just what we consider "clerical."  Courts have blessed amendments that fix a typo in the defendant's name,

*Marmolejos v. United States*, 789 F.3d 66, 71 (2d Cir. 2015), to correct the judgment's reference to three years of supervised release to match the five years announced at sentencing, *United States v. Bates*, 213 F.3d 1336, 1340 (11th Cir. 2000), and to correct a restitution award that was off by $2 million, *United States v. Ervasti*, 201 F.3d 1029, 1046 (8th Cir. 2000). These examples highlight what's implicit in "clerical": Courts can correct human errors so long as they don't impose new substantive conditions to the sentence.

Where does that leave DiPietro? DiPietro didn't bring up interest in his sentencing memo, his objections to the PSR, or at sentencing. He offered no evidence about his inability to pay. So DiPietro has no basis to contest the presumptive requirement to pay restitution interest. *E.g.*, *United States v. Rostan*, 565 F. App'x 798, 800–01 (11th Cir. 2014) ("And given the district court's silence on the matter, it is clear that the court did not exercise its discretion . . . to waive or limit the interest requirements. We therefore conclude that Rostan's original sentence included, by operation of law, a requirement that he pay the statutorily required interest on the restitution ordered." (citations omitted)); *cf. United States v. Embry*, 728 F. App'x 544, 548 (6th Cir. 2018) ("We cannot find that the sentencing court abused its discretion by failing to consider an argument that Defendant did not raise, particularly where, as here, the court would have been obligated only to consider—not to accept—the argument."). The amended judgment reflects what the court understood at sentencing—that DiPietro would have to pay interest. Although the district court was without jurisdiction to enter the amended judgment when DiPietro had already filed his notice of appeal, it may properly do so on remand.

## IX.

For all these reasons, we AFFIRM the sentences of Christos Karasarides Jr. and Ronald DiPietro, but REMAND as to DiPietro with directions to the district court to correct the error in the judgment under Rule 36.